# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 12, 2022         Decided April 7, 2023

No. 22-3038

UNITED STATES OF AMERICA,
APPELLANT

v.

JOSEPH W. FISCHER,
APPELLEE

———

Consolidated with 22-3039, 22-3041

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cr-00234-1)
(No. 1:21-cr-00119-1)

———

*James I. Pearce*, Attorney, Capitol Siege Section, U.S. Department of Justice, argued the cause for appellant.  With him on the brief was *John Crabb, Jr.*, Chief, Capitol Siege Section.

2

*Nicholas D. Smith* argued the cause for appellees.  With him on the brief were *Frederick W. Ulrich*, Assistant Federal Public Defender, and *F. Clinton Broden*. *A. J. Kramer*, Federal Public Defender, and *Ronald A. Krauss*, Assistant Federal Public Defender, entered appearances.

Before: KATSAS, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN, with whom *Circuit Judge* WALKER joins except as to Section I.C.1 and footnote 8.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* WALKER.

Dissenting opinion filed by *Circuit Judge* KATSAS.

PAN, *Circuit Judge*:  As Congress convened on January 6, 2021, to certify the results of the 2020 presidential election in favor of Joseph R. Biden, Jr., thousands of supporters of the losing candidate, Donald J. Trump, converged on the United States Capitol to disrupt the proceedings.  The Trump supporters swarmed the building, overwhelming law enforcement officers who attempted to stop them.  The chaos wrought by the mob forced members of Congress to stop the certification and flee for safety.  Congress was not able to resume its work for six hours.  The question raised in this case is whether individuals who allegedly assaulted law enforcement officers while participating in the Capitol riot can be charged with corruptly obstructing, influencing, or impeding an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).  The district court held that the statute does not apply to assaultive conduct, committed in furtherance of an attempt to stop Congress from performing a constitutionally required duty.  We disagree and reverse.

3

**BACKGROUND**

Appellees Joseph Fischer, Edward Lang, and Garret Miller were charged by indictment in separate cases with various offenses arising from their alleged participation in the Capitol riot on January 6, 2021.  Although we draw from the criminal complaints and pre-trial briefing to describe their alleged conduct, we consider only the indictments to determine the sufficiency of any charge.

Fischer allegedly belonged to the mob that forced Congress to stop its certification process.[1]  On January 6, 2021, he encouraged rioters to "charge" and "hold the line," had a "physical encounter" with at least one law enforcement officer, and participated in pushing the police.  Fischer Crim. Compl., Appellant's Appendix ("App.") 423–27.  Before January 6, he allegedly sent text messages to acquaintances, stating: "If Trump don't get in we better get to war"; "Take democratic [C]ongress to the gallows. . . . Can't vote if they can't breathe . . . lol"; and "I might need you to post my bail. . . .  It might get violent. . . .  They should storm the capital [sic] and drag all the democrates [sic] into the street and have a mob trial."  Gov't Opp'n to Mot. to Clarify and Modify Conditions of Release, App. 433–34.  Fischer's seven-count indictment charges him with assaulting both Capitol Police and MPD officers.  Fischer Indictment, App. 444.

---

[1]    Appellees argue that Fischer could not have obstructed the Electoral College vote certification because he arrived at the Capitol after Congress recessed.  Although the nature and significance of Fischer's conduct are factual issues to be addressed at trial, the government's allegations sufficiently support a theory that Fischer impeded a Congressional proceeding that did not resume for six hours.

4

Lang, as a member of the mob that forced Congress to stop its certification procedure, allegedly fought against police officers in the Capitol for more than two hours, repeatedly striking officers with a bat and brandishing a stolen police shield. His 13-count indictment alleges that he assaulted six Metropolitan Police Department ("MPD") officers, caused bodily injury to one of them, and engaged in disorderly conduct and physical violence with a bat and shield in a restricted area of the Capitol. *See* Lang Indictment, App. 52–57.

Miller allegedly traveled to the District of Columbia "for this [T]rump shit," bringing a grappling hook, rope, bullet-proof vest, helmets, and a mouthguard: He believed that "crazy shit" was going to happen and a "civil war could start." Am. Crim. Compl., App. 75. In his 12-count indictment, the government alleges that Miller was part of the mob that forced its way into the Capitol and stopped Congress's certification process; and that he pushed against U.S. Capitol Police officers to gain entrance to the Rotunda. Shortly after the riot, Miller allegedly took to Twitter and Facebook to advocate the assassination of a U.S. Congresswoman, and to declare that a Capitol Police officer deserved to die, threatening to "hug his neck with a nice rope." Miller Indictment, App. 86–87.

The government charged all three appellees with, among other things, the felony offense of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); and the misdemeanor offenses of Disorderly Conduct in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(D), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(l)(A). The felony assault count alleges that each appellee "did forcibly assault, resist, oppose, impede, intimidate, and interfere with[] an officer and employee of the United States . . . and any person assisting such an officer and

5

employee . . . and . . . the acts in violation of this section involve the intent to commit another felony."    Miller Indictment, App. 86; *see also* Fischer Indictment, App. 444 (also alleging that "the acts in violation of this section involve physical contact with the victim"); Lang Indictment, App. 52 (same).    The disorderly conduct charges specify that each appellee "willfully and knowingly engaged in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress"; and "did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct . . . within the United States Capitol . . . so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions." Miller Indictment, App. 87–88; *see also* Fischer Indictment, App. 445 (alleging similar charges); Lang Indictment, App. 55–57 (same).    Appellees do not challenge the sufficiency of the counts that charge them with felony assault and disorderly conduct.

The government also charged each appellee with one count of Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2), as follows:

On or about January 6, 2021, within the District of Columbia and elsewhere, [Fischer, Lang, and Miller] attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

6

Lang Indictment, App. 55; Miller Indictment, App. 85-86;
Fischer Indictment, App. 444. Each appellee moved to dismiss
the § 1512(c)(2) count, asserting that the statute did not
prohibit his alleged conduct on January 6, 2021. Section
1512(c) provides in full:

> (c) Whoever corruptly—
>> (1) alters, destroys, mutilates, or conceals a
>> record, document, or other object, or attempts
>> to do so, with the intent to impair the object's
>> integrity or availability for use in an official
>> proceeding; or
>> (2) otherwise obstructs, influences, or impedes
>> any official proceeding, or attempts to do so,
> shall be fined under this title or imprisoned not more
> than 20 years, or both.

18 U.S.C. § 1512(c).

The district court granted each appellee's motion to
dismiss. After carefully reviewing the text and structure of the
statute, the district court concluded that § 1512(c) is ambiguous
with respect to how subsection (c)(2) relates to subsection
(c)(1). Although subsection (c)(1) concerns obstructive
conduct involving "a record, document, or other object," and
the words of subsection (c)(2) more generally address
"obstruct[ing], influenc[ing], or imped[ing] any official
proceeding, or attempt[ing] to do so," the district court focused
on the meaning of the word "otherwise" that connects the two
provisions. *United States v. Miller*, 589 F. Supp. 3d 60, 67–69
(D.D.C. 2022). Relying on its understanding of the Supreme
Court's holding in *Begay v. United States*, 553 U.S. 137 (2008),
as well as canons of statutory construction, statutory and
legislative history, and the principles of restraint and lenity, the
district court determined that subsection (c)(2) "must be

7

interpreted as limited by subsection (c)(1)." *Miller*, 589 F. Supp. 3d at 78. That led the district court to hold that subsection (c)(2) "requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id*. Because appellees' indictments do not allege that they violated § 1512(c)(2) by committing obstructive acts related to "a document, record, or other object," the district court dismissed the § 1512(c)(2) counts. *Id*. at 79; *see also United States v. Fischer*, No. 1:21-cr-234 (D.D.C. March 15, 2022) (order relying on *Miller* to dismiss § 1512(c)(2) count); *United States v. Lang*, No. 1:21-cr-53 (D.D.C. June 7, 2022) (minute order relying on *Miller* to dismiss § 1512(c)(2) count). The government filed a motion to reconsider in Miller's case, which the district court denied. *United States v. Miller*, No. 1:21-cr-119, 2022 WL 1718984 (May 27, 2022). This consolidated appeal followed.

### STANDARD OF REVIEW

A defendant in a criminal case may move to dismiss an indictment before trial for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), including because the statute under which he is charged does not apply to his alleged conduct. *Hamling v. United States*, 418 U.S. 87, 117 (1974) (explaining that an indictment must "set forth all the elements necessary to constitute the offense intended to be punished" (citation and internal quotation omitted)); *accord United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). At the motion-to-dismiss stage, the question is whether the indictment states "essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1); *see also United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). "Because a court's 'use of its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury,'

8

dismissal is granted only in unusual circumstances." *Ballestas*, 795 F.3d at 148 (cleaned up) (quoting *Whitehouse v. U.S. Dist. Ct.*, 53 F.3d 1349, 1360 (1st Cir. 1995)). We review the district court's interpretation of § 1512(c)(2) — a question of law — *de novo*. *See United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014).

ANALYSIS

The government asserts that the words "corruptly . . . obstructs, influences, and impedes any official proceeding" in 18 U.S.C. § 1512(c)(2) have a broad meaning that encompasses all forms of obstructive conduct, including appellees' allegedly violent efforts to stop Congress from certifying the results of the 2020 presidential election. Thus, the government contends, the district court erred when it adopted an unduly narrow interpretation of § 1512(c)(2) that limits the statute's application to obstructive conduct "with respect to a document, record, or other object." Gov't's Br. 13 (quoting *Miller*, 589 F. Supp. 3d at 78). For their part, appellees halfheartedly defend the trial court's interpretation, but more vigorously advance a different argument: that § 1512(c)(2) prohibits obstructive acts related not just to "a record, document, or other object," but also to all acts of general "evidence impairment." Appellees' Br. 2, 15. Appellees argue that under either the district court's document-focused reading of the statute or their own evidence-impairment theory, appellees' conduct on January 6, 2021, is beyond the reach of § 1512(c)(2). Faced with these three competing interpretations of the statute, we conclude that the government has the best of this argument.

## I. Interpretation of § 1512(c)(2)

When interpreting a statute, "we begin by analyzing the statutory language, 'assuming that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Hardt*

9

*v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (cleaned up) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)).  If a statute's language is clear, then that language controls.  The Supreme Court has explained:

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations and internal quotation marks omitted); *accord Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) ("If the words of a statute are unambiguous, this first step of the interpretive inquiry is our last.").  Therefore, "[w]e must enforce plain and unambiguous statutory language according to its terms." *Hardt*, 560 U.S. at 251.

## A. Text and Structure

We start by reiterating and examining the text of § 1512(c):

> (c) Whoever corruptly—
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's

10

        integrity or availability for use in an official
        proceeding; or

    (2) otherwise obstructs, influences, or impedes
        any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more
than 20 years, or both.

18 U.S.C. § 1512.

In our view, the meaning of the statute is unambiguous. Subsection (c)(1) contains a specific prohibition against "corruptly" tampering with "a record, document, or other object" to impair or prevent its use in an official proceeding, while subsection (c)(2) proscribes "corrupt[]" conduct that "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . ." Under the most natural reading of the statute, § 1512(c)(2) applies to all forms of corrupt obstruction of an official proceeding, other than the conduct that is already covered by § 1512(c)(1). This reading incorporates the commonplace, dictionary meaning of the word "otherwise": "in a different manner." *See Otherwise*, *Oxford English Dictionary* (3d ed. 2004) (defining "otherwise" as "[i]n another way or ways; in a different manner; by other means; in other words; differently"); *Otherwise*, *Black's Law Dictionary* (6th ed. 1990) (defining "otherwise" as "[i]n a different manner; in another way, or in other ways"); *see also Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227–28 (2014) (using contemporary dictionaries to ascertain ordinary, contemporary, common meaning). Giving the text "its ordinary or natural meaning," *FDIC v. Meyer*, 510 U.S. 471, 476 (1994), the statute essentially says, "Whoever corruptly (1) tampers with a document, record, or object to interfere with its use in an official proceeding; or (2) in a different manner obstructs, influences, or impedes any official proceeding, shall be fined or imprisoned." *See also Wis. Cent. Ltd. v. United States*, 138

11

S. Ct. 2067, 2074 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." (cleaned up) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

That natural, broad reading of the statute is consistent with prior interpretations of the words it uses and the structure it employs. The terms "obstruct," "influence," and "impede" can be found in several statutes pertaining to criminal obstruction of justice, such as 18 U.S.C. § 1503, which targets "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] the due administration of justice"; and § 1505, which addresses "corruptly . . . influenc[ing], obstruct[ing], or imped[ing]" the due and proper administration of law" in certain proceedings or investigations. The parties do not dispute the meaning of those words or their typically expansive scope. *See United States v. Aguilar*, 515 U.S. 593, 598 (1995) ("[T]he 'Omnibus Clause' [of § 1503] serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice. The latter clause, it can be seen, is far more general in scope than the earlier clauses of the statute."); *United States v. Griffin*, 589 F.2d 200, 206–07 (5th Cir. 1979) ("The omnibus clause of [§ 1503] clearly states that it punishes all endeavors to obstruct the due administration of justice."); *United States v. Alo*, 439 F.2d 751, 754 (2d Cir. 1971) (rejecting litigant's attempt "to escape the plain meaning of the broad language of § 1505").

Moreover, the word "otherwise" has been given its common meaning of "in a different manner" when used in similarly structured statutes. Section 1512(c) contains an initial subsection announcing a particular requirement, followed by a separately numbered subsection that begins with the word "otherwise" and introduces a broader requirement.

12

The latter subsection is a "catch-all"[2] that "cover[s] otherwise obstructive behavior that might not constitute a more specific offense" involving documents, records, or objects under § 1512(c)(1). *United States v. Petruk,* 781 F.3d 438, 447 (8th Cir. 2015) (internal quotation marks omitted) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)). Such "catch-all" structures *are not* uncommon. *See, e.g.*, 18 U.S.C. § 1952(a)(3); 28 U.S.C. § 2466(a)(1)(C). In such statutes, "the use of the introductory word 'otherwise' indicates that the evasion referred to in the [catch-all provision] reaches beyond the[] specific examples [in the preceding sections] to myriad means that human ingenuity might devise . . . ." *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (discussing 28 U.S.C. § 2466(a)(1)(C)); *see also United States v. O'Hara*, 143 F. Supp. 2d 1039, 1042 (E.D. Wis. 2001) ("The use of 'otherwise' in [18 U.S.C.] § [1952](a)(3) indicates that in Congress's view, intending to commit a crime of violence under § (a)(2) is simply one way in which an offender can intend to promote or facilitate unlawful activity. What distinguishes violations of §§ (a)(2) and (a)(3) is . . . whether the offender intends to promote or facilitate unlawful activity by committing a crime of violence (which would violate § (a)(2)) or by some other means (which would violate § (a)(3)).").

Thus, the broad interpretation of the statute — encompassing all forms of obstructive acts — is unambiguous and natural, as confirmed by the "ordinary, contemporary,

---

[2]     Courts also have described § 1512(c)(2) as a "residual" or "omnibus" clause. *See, e.g.*, *United States v. Gillespie*, No. 1:22-cr-60, 2022 WL 17262218, at *4 (D.D.C. Nov. 29, 2022) (describing § 1512(c)(2) as a "residual clause"); *United States v. Hutcherson*, No. 6:05-cr-39, 2006 WL 1875955, at *3 (W.D. Va. July 5, 2006) (describing § 1512(c)(2) as an "omnibus clause"). These terms are functionally similar.

13

common meaning" of the provision's text and structure. *Perrin*, 444 U.S. at 42.

## B. Precedents

Not surprisingly, the vast majority of courts interpreting the statute have adopted the natural, broad reading of § 1512(c)(2), applying the statute to all forms of obstructive conduct that are not covered by subsection (c)(1).

The Seventh and Eighth Circuits have both acknowledged the expansive ambit of subsection (c)(2). *See Petruk*, 781 F.3d at 447 ("[Section] 1512(c)(2) operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." (citation omitted)); *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) ("The expansive language in this provision operates as a catch-all to cover 'otherwise' obstructive behavior that might not fall within the definition of document destruction.").

Furthermore, our peer circuits have applied the statute to reach a wide range of obstructive acts, not just those limited to tampering with documents or objects. Those courts have found "otherwise" obstructive conduct under subsection (c)(2) to include: (1) lying in written responses to civil interrogatory questions, *Burge*, 711 F.3d at 808–09; (2) soliciting information about a grand jury investigation to evade surveillance, *Volpendesto*, 746 F.3d at 286; (3) seeking a false alibi witness, *Petruk*, 781 F.3d at 444, 447; (4) tipping off the targets of criminal investigations, *United States v. Ahrensfield*, 698 F.3d 1310, 1324–25 (10th Cir. 2012); (5) asking third parties to create fraudulent physical evidence, *United States v. Desposito*, 704 F.3d 221, 230–33 (2d Cir. 2013); (6) giving misleading testimony in a preliminary injunction hearing, *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014);

14

(7) attempting to orchestrate a grand jury witness's testimony, *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007); (8) making false statements to a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); and (9) burning an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021).

To defend a narrower reading of the statute, appellees note that the above-cited cases involve "evidence impairment," Appellees' Br. 25–26, and insist that "the extension of Section 1512(c)(2) to acts not intended to affect the availability or integrity of evidence is unprecedented," *id*. 16. While the cited cases happen to address behavior that impaired evidence, none of them suggests that subsection (c)(2) is limited to such conduct. Indeed, as discussed above, several of the opinions affirmatively describe § 1512(c)(2) in capacious terms. *See, e.g.*, *Petruk*, 781 F.3d at 446–47; *Volpendesto*, 746 F.3d at 286. Moreover, contrary to appellees' claim, case law does not uniformly apply the statute to circumstances involving evidence impairment: The Second Circuit upheld a conviction under § 1512(c)(2) where the defendant created a forged court order, which did not impair evidence but deceived the recipient into withdrawing an application for a writ of mandamus. *See United States v. Reich*, 479 F.3d 179, 185–87 (2d Cir. 2007) (Sotomayor, J.).

Notably, no fewer than fourteen district judges in this jurisdiction have adopted the broad reading of the statute urged by the government to uphold the prosecution of defendants who allegedly participated in the Capitol riot.[3] Although the

---

[3]    *See Gillespie*, 2022 WL 17262218, at *4–5 (Howell, J.); *United States v. Hale-Cusanelli*, No. 21-cr-37, 2022 WL 4300000, at *1 (D.D.C. Sept. 19, 2022) (McFadden, J.); *United States v. Robertson*,

15

opinions of those district judges are not binding on us, the near unanimity of the rulings is striking, as well as the thorough and persuasive reasoning in the decisions.  *See, e.g.*, *McHugh*, 2022 WL 1302880; *Montgomery*, 578 F. Supp. 3d 54; *Sandlin*, 575 F. Supp. 3d 16.  The district judge in the instant case stands alone in ruling that § 1512(c)(2) cannot reach the conduct of January 6 defendants.[4]

---

610 F. Supp. 3d 229, 233–35 (D.D.C. 2022) (Cooper, J.); *United States v. Williams*, No. 21-cr-618, 2022 WL 2237301, at *17 n.13 (D.D.C. June 22, 2022) (Berman Jackson, J.); *United States v. Fitzsimons*, 605 F. Supp. 3d 132, 137, 142–150 (D.D.C. 2022) (Contreras, J.); *United States v. Bingert*, 605 F. Supp. 3d 111, 123–28 (D.D.C. 2022) (Lamberth, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, 596 F. Supp. 3d 90, 107–08, 107 n.4 (D.D.C. 2022) (Friedman, J.); *United States v. Grider*, 585 F. Supp. 3d 21, 29–31 (D.D.C. 2022) (Kollar-Kotelly, J.); *United States v. Nordean,* 579 F. Supp. 3d 28, 43–46 (D.D.C. 2021) (Kelly, J.); *United States v. Montgomery*, 578 F. Supp. 3d 54, 69–79 (D.D.C. 2021) (Moss, J.); *United States v. Mostofsky*, 579 F. Supp. 3d 9, 24–26 (D.D.C. 2021) (Boasberg, J.); *United States v. Caldwell*, 581 F. Supp. 3d 1, 20–33 (D.D.C. 2021) (Mehta, J.); *United States v. Sandlin*, 575 F. Supp. 3d 16, 24–28 (D.D.C. 2021) (Friedrich, J.).

[4]     The only cases we are aware of that align with the district court's narrowed interpretation are *United States v. Singleton*, No. H-06-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) ("[T]o violate § 1512(c)(2), the charged conduct must have some reasonable nexus to a record, document or tangible object."); and *United States v. Hutcherson*, No. 605-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) ("Section 1512(c)(1) lists specific conduct that is prohibited under this subsection; while § 1512(c)(2) is intended to account for unenumerated conduct that violates the subsection.  If an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object, such person violates this

16

To be sure, outside of the January 6 cases brought in this jurisdiction, there is no precedent for using § 1512(c)(2) to prosecute the type of conduct at issue in this case. But "the whole value of a generally phrased residual clause . . . is that it serves as a catchall for matters not specifically contemplated . . . ." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009); *see also Griffin*, 589 F.2d at 206–07 ("The obstruction of justice statute [§ 1503] was drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." (citation and internal quotation marks omitted)). As the Supreme Court has noted: "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)).

**C. Other Elements**

Although the text of § 1512(c)(2) plainly extends to a wide range of conduct, the statute contains some important limitations: The act of "obstruct[ing], influenc[ing], and imped[ing]" described in subsection (c)(2) must be accompanied by "corrupt" intent; and the behavior must target an "official proceeding." Those other elements of a § 1512(c)(2) offense are not the focus of this appeal, but we nevertheless note that they provide significant guardrails for prosecutions brought under the statute.

---

subsection."). We have reviewed those cases and find them unpersuasive.

17

*1.  "Corrupt" Intent*

The district court expressly declined to interpret "corruptly" as used in § 1512(c), concluding only that "the common meanings of 'corruptly' are sufficiently capacious so as not to limit or clarify the *actus reus* charged in the Indictment." *Miller*, 2022 WL 1718984, at *5 n.3 (denying government's motion for reconsideration).  I do not agree that the meaning of "corruptly" is necessarily "capacious," and note that a narrow construction of "corruptly" would indeed limit the *actus reus* of a § 1512(c)(2) violation.  The requirement of "corrupt" intent prevents subsection (c)(2) from sweeping up a great deal of conduct that has nothing to do with obstruction — for instance, lobbyists who know they advocate for morally wrongful causes.  *See* Appellees' Br. 47.  Notably, the other crimes enumerated in § 1512 — such as killing, threatening, or dissuading witnesses — are classic examples of obstruction of justice.  *See Obstruction of Justice*, *Black's Law Dictionary* (9th ed. 2009) (defining "obstruction of justice" as "willful act[s] of corruption, intimidation or force which tends[] in any way to distort or impede the administration of law." (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 552 (3d ed. 1982))).  Subsection (c)(2) best fits with those crimes if "corruptly" constrains its scope.

As relevant to the instant case, the allegations against appellees appear to be sufficient to meet any proposed definition of "corrupt" intent.  Without expressing a preference for any particular definition of "corruptly," I consider three candidates.  First, in considering the meaning of 18 U.S.C. § 1512(b) in *Arthur Andersen LLP v. United States*, the Supreme Court noted that the "natural meaning" of "corruptly" is "clear" and that the word is "normally associated with wrongful, immoral, depraved, or evil" conduct.  544 U.S. 696, 705 (2005).  Second, the government here asserts that the

18

element of a "corrupt" state of mind is satisfied when a defendant acts "with a corrupt purpose," through "independently corrupt means," or both.  Gov't's Reply 24 (quoting *Sandlin*, 575 F. Supp. 3d at 31); *see also United States v. North*, 910 F.2d 843, 942–43 (D.C. Cir. 1990) (Silberman, J., concurring and dissenting in part).  A third definition of the term "corruptly" was endorsed by Justice Scalia in his partial concurrence in *United States v. Aguilar*, which examined the phrase "corruptly . . . endeavors to influence, obstruct or impede the due administration of justice" under § 1503.  515 U.S. at 616–17 (Scalia, J., concurring and dissenting in part).  Justice Scalia quoted with approval a jury instruction specifying that "[a]n act is done corruptly if it's done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method, with a hope or expectation of either financial gain or other benefit to oneself or a benefit of another person."  *Id.*

Under all those formulations, "corrupt" intent exists at least when an obstructive action is independently unlawful — *i.e.*, an independently unlawful act is necessarily "wrongful" and encompasses a perpetrator's use of "independently corrupt means" or "an unlawful method."  *Id.*; *North*, 910 F.2d at 942–43 (Silberman, J., concurring and dissenting in part); *see also Sandlin*, 575 F. Supp. 3d at 33–34.  Each appellee in this consolidated appeal is charged with assaulting law enforcement officers while participating in the Capitol riot, and such behavior clearly meets the test of independently unlawful conduct.  Furthermore, the additional element identified by Justice Scalia also appears to be met:  Appellees' alleged intentions of helping their preferred candidate overturn the election results would suffice to establish a "hope or expectation of either . . . benefit to oneself or a benefit of another person."  *Aguilar*, 515 U.S. at 616–17 (Scalia, J., concurring and dissenting in part).  Thus, the sufficiency of the

19

indictments in this case does not turn on the precise definition of "corruptly." Because the task of defining "corruptly" is not before us and I am satisfied that the government has alleged conduct by appellees sufficient to meet that element, I leave the exact contours of "corrupt" intent for another day.

The concurring opinion embraces the definition of "corruptly" that requires proof that the defendant acted "with an intent to procure an unlawful benefit either for himself or for some other person." Concurring Op. at 1. But the meaning of "corruptly" was discussed only peripherally in the parties' briefs and in the district court's opinion, and no party requested the standard that the concurrence adopts. Thus, the detailed analysis proffered by the concurrence is not a product of the crucible of litigation. *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."); *accord United States v. Van Smith*, 530 F.3d 967, 974 (D.C. Cir. 2008). Forgoing the benefits of the normal litigation process may cause us to overlook arguments, precedents, and practical considerations that the parties would have brought to our attention to aid our decision-making if they were given that opportunity. *Cf. United States v. West*, 392 F.3d 450, 459 (D.C. Cir. 2004) ("Rulings on issues that have not been fully argued run the risk of being improvident or ill-advised." (internal quotation and citation omitted)). For example, the concurring opinion does not appear to consider that there are around 50 other references to "corruptly" in Title 18 of the U.S. Code. Adopting the concurrence's definition of "corruptly" could make it more difficult for the government to prosecute all the crimes defined in those other statutes — including obstruction of justice under 18 U.S.C. § 1503, a statute for which the Supreme Court has declined to approve the very definition of

20

"corruptly" espoused by the concurrence.  *See Aguilar*, 515
U.S. at 599–602.  Adding a new element to be proved in other
prosecutions involving "corrupt" intent would be a significant
change, which the government has not had a chance to address.
At least one pending case on this court's docket squarely raises
the definition of "corruptly" under § 1512(c).  *See United
States v. Robertson*, No. 22-3062.  It is more prudent to delay
addressing the meaning of "corrupt" intent until that issue is
properly presented to the court.

Although the dissenting opinion disagrees with this
opinion about the scope of the *actus reus* under § 1512(c), we
share much common ground on the issue of *mens rea*.  The
dissent declines to settle on a precise meaning of "corruptly" at
this time, declines to endorse the concurrence's definition of
"corruptly," and recognizes that § 1512(c) is not vague as
applied to the "extreme conduct" of the appellees in this case.
*See* Dissenting Op. at 31–38 (discussing possible definitions of
"corruptly"), 35–37 (criticizing definition of "corruptly"
favored by the concurrence), 37 (stating that it is "true" that
§ 1512(c) "is not vague as applied to the extreme conduct
alleged here").  Notably, there does not appear to be any
conflict between the dissent and this opinion regarding the
sufficiency of the allegations against the appellees in this case
to establish the requisite *mens rea*.  The dissent expresses
concern about how to address the *mens rea* of advocates,
lobbyists, and peaceful protesters, who are not before the court,
*see id.* at 32–34, 37; but the dissent never takes the position that
appellees did not act "corruptly" when they assaulted police
officers to obstruct proceedings before the Congress.  Instead,
the dissent argues only that the *mens rea* element does not
meaningfully limit the scope of § 1512(c) and that we should

21

acknowledge that Congress limited the *actus reus* to narrow the reach of the statute. *Id.* at 38.[5]

---

[5]     The concurrence suggests that its opinion might bind future panels under *Marks v. United States*, 430 U.S. 188 (1977). The *Marks* rule instructs that, "when the [Supreme] Court issues fragmented opinions, the opinion of the Justices concurring in the judgment on the 'narrowest grounds' should be regarded as the Court's holding." *King v. Palmer*, 950 F.2d 771, 780 (D.C. Cir. 1991) (en banc) (quoting *Marks*, 430 U.S. at 193). But this court has never applied *Marks* to its own cases. It seems that only one federal appellate court has done so, *see Binderup v. U.S. Att'y Gen.*, 836 F.3d 336, 356 (3d Cir. 2016) (en banc), and there is good reason not to extend *Marks* any further. The *Marks* rule is "'more easily stated than applied . . . [it] has so obviously baffled and divided the lower courts that have considered it' that it has created a 'degree of confusion' such that it is not aways 'useful to pursue to the utmost logical possibility.'" *United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) (cleaned up) (quoting *Nichols v. United States*, 511 U.S. 738, 745–46 (1994)). Moreover, "[b]ecause it applies precisely when there is no majority view of the law, *Marks* creates precedents that are unlikely to be either legally correct or practically desirable." Richard M. Re, *Beyond the* Marks *Rule*, 132 Harv. L. Rev. 1942, 1946 (2019).

     In any event, the instant case is a poor vehicle for applying *Marks*. First, the concurring opinion's attempt to establish its view as controlling must fail because a majority of the panel has expressly declined to endorse the concurrence's definition of "corruptly." *See supra* at 17–21; Dissenting Op. at 36–37 ("The concurrence's approach thus requires transplanting into section 1512(c)(2) a *mens rea* requirement that has been used so far only in tax law."). Second, the concurrence's definition is not one with which this opinion "must *necessarily agree as a logical consequence* of its own, broader position" because this opinion takes *no* position on the exact meaning of "corruptly." *King*, 950 F.2d at 782 (emphasis added). This opinion's holding on "corruptly" is grounded in the mere *sufficiency*

22

Finally, appellees err in arguing that the term "corruptly" "takes on unconstitutional vagueness" in circumstances outside the context of a judicial proceeding. Appellees' Br. 33. A criminal law violates the Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Appellees contend that prohibiting "bad, evil, and improper" purposes is insufficient where congressional proceedings are implicated because "no one can seriously question that people constantly attempt, in innumerable ways, to obstruct or impede congressional committees." Appellees' Br. 33–34 (quoting *North*, 910 F.2d at 882; *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir. 1985)). But it is beyond debate that appellees and other members of the public had fair notice that assaulting law enforcement officers in an effort to prevent Congress from certifying election results was "wrongful" and "corrupt" under the law. *See also* Dissenting Op. at 37 (stating that it is "true" that § 1512(c) "is not vague as applied to the extreme conduct alleged here").

---

of the allegations in this particular case — it states only that the alleged conduct of the three appellees is sufficient under any understanding of "corrupt" intent. *See supra* at 17–18, 21. By contrast, the concurring opinion goes further and affirmatively adopts a new test for "corrupt" intent that has not been requested by any party — that is not a "logical subset" of an opinion that expresses no preference for any definition of "corruptly." *See supra* at 18; *King*, 950 F.2d at 781; *cf. Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015) ("[N]either opinion can be considered the *Marks* middle ground or narrowest opinion, as the four Justices in dissent simply did not address the issue.").

23

### 2.  *"Official Proceeding"*

The district court ruled that congressional certification of the Electoral College count is an "official proceeding." *See Miller*, 589 F. Supp. 3d at 66–67 ("[A]s used in § 1512, 'official proceeding' is a defined term, and its definition covers the Congressional certification of Electoral College results."). Appellees challenge that ruling, apparently as an alternative basis to uphold the district court's dismissal of the § 1512(c)(2) count. *See Yeager v. United States*, 557 U.S. 110, 126 (2009) (prevailing party may defend judgment on any grounds properly raised below); *United States v. Coughlin*, 610 F.3d 89, 108 (D.C. Cir. 2010) (explaining that "this court can affirm a correct decision even if on different grounds than those assigned in the decision on review" (citation omitted)).

We agree with the district court.  The statutory definition of "official proceeding" under § 1512(c)(2) includes a "proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  Although appellees strain to argue that the Electoral College vote certification is not a "proceeding before the Congress" because it does not involve "investigations and evidence," Appellees' Br. 40, 43–47, we see no such limit in the ordinary meaning of the word "proceeding."  *See Proceeding*, *Oxford English Dictionary* (2d ed. 1989) ("[T]he carrying on of an action or series of actions.").  Appellees rely on a narrower, alternative definition of "proceeding" to support their position — "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment; any procedural means for seeking redress from a tribunal or agency; and the business conducted by a court or other official body; a hearing." Appellees' Br. 45 (citing *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, *Black's Law Dictionary* (8th ed. 2004))).  But that definition is

24

inapt when interpreting the meaning of a "proceeding *before the Congress.*"  18 U.S.C. § 1515(a)(1)(B) (emphasis added).

Notably, Congress follows statutory directives to complete the certification of the Electoral College vote, including: (1) convening a joint session at 1:00 PM on January 6 in the year following the presidential election; (2) appointing four tellers to read and list the votes; (3) announcement of the voting results by the President of the Senate; and (4) allowing written objections from members of Congress, subject to a procedure for submitting and resolving such objections.  *See* 3 U.S.C. § 15.  Those directives reflect Congress's own intent that the vote certification shall be a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).

\*    \*    \*

In sum, the necessity of "corrupt" intent and the statutory definition of "official proceeding" both serve to meaningfully cabin the scope of § 1512(c)(2).  The statute therefore is not so expansive as to demand a narrowing construction, as appellees appear to contend.

## II. Alternative Interpretations

In contrast to the straightforward reading of § 1512(c)(2) urged by the government, appellees and the district court's interpretations of the statute "read like elaborate efforts to avoid the most natural meaning of the text."  *Patel v. Garland*, 142 S. Ct. 1614, 1623 (2022).  The district court deployed tools of statutory construction and a historical analysis to conclude that § 1512(c)(2) is applicable only if a defendant takes "action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Miller*, 589 F. Supp. 3d at 78.  Appellees employ the same tools to argue that the subsection is restricted to "discrete acts

25

intended to affect the availability or integrity of evidence used in an official proceeding." Appellees' Br. 15. Additionally, appellees assert that § 1512(c)(2) does not apply to their alleged conduct under the principles of lenity and restraint. Although we find the language of the statute unambiguous and could end our analysis there, *see Conn. Nat'l Bank*, 503 U.S. at 253–54, we have nevertheless reviewed the district court's detailed analysis, as well as appellees' alternative construction. We find both interpretations unpersuasive.

**A. Statutory Text and Structure**

The district court construed the term "otherwise" in § 1512(c)(2) to mean "similar . . . in some respects but different in others." *See Miller*, 589 F. Supp. 3d at 71 (quoting *Begay*, 553 U.S. at 144). This construction requires a violation of subsection (c)(2) to be "similar" to the violation proscribed in subsection (c)(1). Thus, according to the district court, (c)(2) captures only offenses related to documents, records, or objects that are not covered by subsection (c)(1).

Appellees, meanwhile, endorse the district court's definition of "otherwise" but argue that the similarity between the two subsections is that they both address "evidence impairment." Appellees' Br. 18–20. Appellees further assert that their narrowing interpretation is compelled by the principles that courts should not construe general terms to render a statute's more specific proscriptions meaningless (the *ejusdem generis* canon) and should construe words in a statute in light of the company they keep (the *noscitur a sociis* canon). In their view, the terms "obstruct[ing], influenc[ing], or imped[ing]" found in subsection (c)(2) are general ones that follow and "keep company" with subsection (c)(1)'s "more specific" terms of "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]." Appellees' Br. 19. As a result, they contend,

26

"subsection (c)(2) criminalizes acts different from the object-impairment crimes listed in subsection (c)(1) but which are still intended to affect the integrity or availability of evidence . . . ." *Id.* at 20.

As an initial matter, it is implausible that Congress intended § 1512(c)(2) to apply to obstructive acts related only to documents, objects, records, or other evidence, yet chose the words "otherwise obstructs, influences, or impedes any official proceeding" to express that intent. If Congress's goal were to criminalize a subset of obstructive behavior, it easily could have used words that precisely define that subset, such as "otherwise compromises a record, document, or other object," or "otherwise impairs the integrity or availability of evidence for use in an official proceeding." *See Montgomery*, 578 F. Supp. 3d at 73. In fact, Congress enacted exactly that kind of precise directive in § 1505 and in § 1519, the latter at the same time as § 1512(c). *See* 18 U.S.C. § 1505 ("Whoever . . . withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material . . . [s]hall be [fined, imprisoned, or both]."); § 1519 ("Whoever . . . alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object . . . shall be [fined, imprisoned, or both]."); *see also* Sarbanes-Oxley Act, Pub. L. No. 107-204, § 802(a), 116 Stat 745, 800 (2002). Congress thus has demonstrated its capacity to clearly target document-related misconduct when it wishes to do so. To accept either the document-focused or evidence-limited interpretation of § 1512(c), we would have to conclude that Congress expressed its intent with words that were almost certain to be misunderstood. *See supra* Section I.B (enumerating the many federal courts that have given § 1512(c)(2) its natural, broad reading and failed to decode the statute's ostensibly "true" meaning).

27

The district court's cramped, document-focused interpretation is also dubious because the words of § 1512(c)(1) are already quite comprehensive — that subsection addresses "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]" documents, records, and objects. It is difficult to envision why a catch-all aimed at even more document-related acts would be necessary as a backstop. Although the district court opined that § 1512(c)(1) arguably does not account for conduct that "covers up, falsifies, or makes a false entry in" a record or document, *see Miller*, 589 F. Supp. 3d at 71, we cannot assume, and think it unlikely, that Congress used expansive language to address such narrow concerns. We must accept, and think it far more likely, that Congress said what it meant and meant what it said: Section 1512(c)(2) prohibits all acts that obstruct, influence, or impede any official proceeding or attempt to do so, beyond the document or object-related acts that are already covered by § 1512(c)(1). *See Conn. Nat'l Bank*, 503 U.S. at 253–54.

The district court appeared to believe that its interpretation of § 1512(c)(2) was compelled by *Begay v. United States*. *See Miller*, 589 F. Supp. 3d at 71, 71 n.8. There, the Supreme Court considered whether driving under the influence ("DUI") qualified as a violent felony under 18 U.S.C. § 924(e)(2)(B)(ii), which defines a violent felony as a crime punishable by over a year's imprisonment that "is burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a serious potential risk of physical injury to another . . . ." § 924(e)(2)(B)(ii) (emphasis added); *Begay*, 553 U.S. at 140. The Court concluded that a DUI was not a violent felony because "the provision's listed examples — burglary, arson, extortion, or crimes involving the use of explosives — illustrate the kinds of crimes that fall within the statute's scope[,]" and a DUI was not "roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Begay*, 553 U.S. at

28

142–43.  In reaching that conclusion, the Court rejected the government's argument "that the word 'otherwise' is *sufficient* to demonstrate that the examples do not limit the scope of the clause."  *Id.* at 144 (emphasis in original).

*Begay* is inapposite because it interprets a statute with a very different structure.  Section 924(e)(2)(B)(ii) includes a list of examples followed by "otherwise" in a single, unbroken sentence within the same subparagraph.  *See* § 924(e)(2)(B)(ii) ("burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a serious potential risk of physical injury to another" (emphasis added)).  By contrast, the "otherwise" clause in § 1512(c)(2) sits within a separately numbered subparagraph, after a semicolon and line break, all of which put distance between it and the lists of verbs and objects included in subsection (c)(1).  Thus, while the position of "otherwise" in § 924(e)(2)(B)(ii) inherently relates the word to the list immediately before it, § 1512(c)(2)'s structure places (c)(1) and (c)(2) "visually on an equal footing and indicat[es] that they have separate meanings."  *Loughrin v. United States*, 573 U.S. 351, 359 (2014) (explaining that "two clauses [that] have separate numbers, line breaks before, between, and after them, and equivalent indentation" have "separate meanings.").

Moreover, *Begay* did not ultimately rely on the more obscure reading of "otherwise" embraced by the district court and appellees, focusing instead on the structure of § 924(e)(2)(B)(ii).  Indeed, the *Begay* Court conceded that the definition of "otherwise" favored by the district court and appellees need not inexorably be applied, noting that "the word 'otherwise' *can* (we do not say *must*) refer to a crime that is similar to the listed examples in some respects but different in others . . . ."  *Id.* at 144 (emphasis in original) (citing *id*. at 150–51 (Scalia, J., concurring in the judgment)).  *Begay* thus does

29

not dictate an evidence-focused reading of § 1512(c)(2), and does not necessarily even support it.

Appellees' invocation of the *ejusdem generis* and *noscitur a sociis* canons also does not convince us to reject the natural reading of § 1512(c)(2). "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *dog, cats, horses, cattle, and other animals*." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) (emphasis in original). In other words, the canon requires that the term at issue be "directly preceded by a list of terms." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021). Likewise, the *noscitur a sociis* or associated-words canon generally instructs that "a word is known by the company it keeps," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008), but requires some context cues indicating that the statutory text should be limited by its company, *see id.*, and "especially holds that 'words grouped in a list should be given related meanings,'" Scalia & Garner, *Reading Law* 195 (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)). *See also Overdevest Nurseries*, 2 F.4th at 983 ("[T]he *noscitur* canon appl[ies] when the term in question is directly preceded by a list of terms."). In § 1512(c)(2), the word "otherwise" does not immediately follow a list of terms. The supposedly general verbs appellees cite are in separate subparagraphs that provide no other cues that they should be read in concert with the specific verbs or objects preceding them. *See* § 1512(c)(2); *Ali*, 552 U.S. at 226.

More fundamentally, appellees do not identify any "common attribute" connecting the two subsections, undermining their reliance on contextual canons. *See Ali*, 552 U.S. at 224–26. The subsections' disparate verbs and objects defy any attempt to group them together: subsection (c)(1)

30

protects "a record, document, or other object" from being "altered, destroyed, mutilated or concealed" while subsection (c)(2) prohibits "obstructing, influencing or impeding any official proceeding." § 1512(c).  The verbs and nouns in each subsection do not share any qualities or characteristics that help determine their meaning in context.  Indeed, it is challenging to imagine how anyone could either alter, destroy, mutilate, or conceal an official proceeding, or obstruct, influence, or impede a record.  *See Ali*, 552 U.S. at 224–26; *cf. Yates*, 574 U.S. at 549–52 (Alito, J. concurring in the judgment) (explaining that *noscitur a sociis* and *ejusdem generis* canons applied in part because the verbs and nouns shared common attributes).  The *ejusdem generis* and *noscitur a sociis* canons are therefore irrelevant.  *See also Yates v. United States*, 574 U.S. 528, 545 (2015) (explaining that *Begay* relied on principle of *ejusdem generis*).

**B. Statutory History and Context**

The district court concluded, and appellees now argue, that § 1512(c)(2)'s historical development and context foreclose the natural reading of its words.  Of course, we need not consider the legislative history because the meaning of the statute is clear from its text.  *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1261 (D.C. Cir. 2020).  Nevertheless, we have reviewed the district court's analysis of the statute's development and history and find nothing in those materials that is inconsistent with a broad reading of the statute.

*1. Statutory Development and Legislative History*

Congress enacted § 1512(c)(2) as part of the Sarbanes-Oxley Act.  That "Act, all agree, was prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen LLP, had

31

systematically destroyed potentially incriminating documents." *Yates*, 574 U.S. at 535–36. The Enron prosecutions revealed a critical gap in the U.S. Code: The then-current version of § 1512(b) prohibited a defendant from persuading another person to destroy records in connection with an investigation or other proceeding but imposed no liability on those who personally destroyed evidence. *See id.* at 536; *see also* S. Rep. No. 107-146, at 6–7 (May 6, 2002) ("[C]ertain current provisions in Title 18, such as section 1512(b), make it a crime to persuade another person to destroy documents, but not a crime for a person to destroy the same documents personally. . . . [I]n the current Andersen case, prosecutors have been forced to use the 'witness tampering' statute, 18 U.S.C. 1512, and to proceed under the legal fiction that the defendants are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves.").

The district court and appellees contend that a broad reading of the statute is unsupported by the statutory history because such a construction does more than simply fill the gap exposed by the Enron scandal. But any discrepancy between Congress's primary purpose in amending the law and the broad language that Congress chose to include in § 1512(c)(2) must be resolved in favor of the plain meaning of the text. After all, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *accord Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

Appellees and the district court's reliance on legislative history to support their interpretations of § 1512(c) is also unavailing. Although the Senate Report on the initial draft of

32

the Sarbanes-Oxley Act explains that provisions like § 1519 were intended to address corporate, evidence-related fraud, *see Yates*, 574 U.S. at 536, that Report sheds no light on the purpose of § 1512(c). Unlike the other provisions of the Act, § 1512(c) was introduced in a floor amendment late in the legislative process. *See* 128 Cong. Rec. S6542 (daily ed. July 10, 2002). The title of that amendment — "Tampering with a Record *or Otherwise Impeding an Official Proceeding*" — not only tracks the language of subsections § 1512(c)(1) and (c)(2), but also suggests that subsection (c)(2) prohibits any obstruction of an official proceeding. *See id.* (emphasis added); Sarbanes-Oxley Act, § 1102; *see also Yates*, 574 U.S. at 540 ("While . . . headings are not commanding, they supply cues" about Congress's intent).

The district court and appellees postulate that the title of § 1512 — "Tampering with a witness, victim, or an informant" — is significant because it "captures the narrow, evidentiary focus of the rest of the statute." *Miller*, 589 F. Supp. 3d at 73 n.9. But as the district court acknowledged, that title does not reflect *any* of the behavior prohibited by § 1512(c). *See Miller*, 589 F. Supp. 3d at 73 n.9. It appears that Congress chose not to update the title of § 1512 when it passed the Sarbanes-Oxley Act, even though the Act indisputably expanded liability under that section. *Compare* Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, § 4, 96 Stat 1248, 1249 (1982) (originally enacting § 1512), *with* Sarbanes-Oxley Act § 1102. We therefore find the title of the amendment proposing § 1512(c) more enlightening than the outdated and unaltered title of § 1512.

The only other hints about Congress's intent in adding § 1512(c) are found in floor statements. "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history." *See NLRB v. SW Gen., Inc.*, 580 U.S.

33

288, 307 (2017).  To the extent that such statements are useful here, they suggest that § 1512(c) was intended to cover more than just document-related or evidence-impairment crimes.  To be sure, some statements by Senators Trent Lott and Orrin Hatch reflect a desire to prohibit the destruction of documents or evidence.  *See* 148 Cong. Rec. S6545 (statement of Sen. Lott) ("The second section [of the amendment] would enact stronger laws against document shredding . . . I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year."), S6550 (statement of Sen. Hatch) ("[T]his amendment would permit the government to prosecute an individual who acts alone in destroying evidence, even where the evidence is destroyed prior to the issuance of a grand jury subpoena.").  Yet Senator Hatch also indicated that the amendment was aimed at obstruction generally, remarking that it "strengthens an existing federal offense that is often used to prosecute document shredding *and other forms of obstruction of justice*."  *Id.* S6550 (emphasis added).

In short, subsection (c)(2)'s historical development is entirely consistent with the broad language of its text.

## *2. Statutory Context: Surplusage and Mouseholes*

The district court and appellees further believe that the doctrine disfavoring "surplusage" weighs in favor of a limiting interpretation.  They contend that reading subsection (c)(2) broadly renders other, more specific prohibitions, like those in subsection (c)(1), unnecessary or "surplusage."  Specifically, the district court asserted that the broad reading of § 1512(c)(2) would swallow conduct already made unlawful by provisions in § 1512 that generally prohibit indirect attempts to obstruct

34

or impede a proceeding.[6]    Appellees add that the natural reading of § 1512(c)(2) would duplicate § 1503 and § 1505.

As the district court acknowledged, "superfluity is not typically, by itself, sufficient to require a particular statutory interpretation." *Miller*, 589 F. Supp. 3d at 73 (citing *Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995)). Indeed, "[w]e find redundancies that are . . . pitted against otherwise plain meanings to be feeble interpretive clues." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018).    Moreover, "substantial" overlap between provisions "is not uncommon in criminal statutes."    *Loughrin*, 573 U.S. at 358 n.4 (citing *Hubbard*, 514 U.S. at 714 n.14).    Here, even if we were to accept the interpretations of the district court and appellees, there would be numerous other subsections that also apply to corruptly obstructing an official proceeding through conduct affecting documents, records, or other objects, or the integrity or availability of evidence.[7]    Thus, the canon against

---

[6]    The overlapping provisions cited by the court include § 1512(a)(1)(A) and (B) (prohibiting killing another for obstructive purposes); § 1512(a)(2)(A), (B)(i), and (B)(iii)–(iv) (prohibiting using physical force or the threat of physical force against any person for obstructive purposes); § 1512(b)(1) (prohibiting intimidation, threats, or corrupt persuasion of another to obstruct testimony in an official proceeding); § 1512(b)(2)(A), (C), and (D) (prohibiting causing or inducing any person to withhold testimony or evidence from an official proceeding, to avoid appearing or providing evidence at an official proceeding, or to be absent from an official proceeding); and § 1512(d)(1) (prohibiting harassment of another that obstructs any person from attending or testifying in an official proceeding).

[7]    *See, e.g.*, § 1503 (forbidding corruptly influencing, obstructing, or impeding the due administration of justice, or attempting to do so); § 1512(a)(1)(B),    (a)(2)(B)(i)–(ii),    (b)(2)(A)–(B)    (forbidding violence, intimidation, corrupt persuasion, or misleading conduct

35

superfluity carries little weight here because it "'merely favors that interpretation which *avoids* surplusage,' not the construction substituting one instance of superfluous language for another." *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (emphasis in original) (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012)).

Much of the superfluity engendered by § 1512(c) is easily explained by the fact that Congress drafted and enacted that subsection after the rest of § 1512. *See Yates*, 574 U.S. at 541. Subsection (c) prohibits both direct and indirect obstruction of official proceedings, and adds a catch-all provision. The subsection was inserted into a statute that already addressed specific forms of indirect obstruction of proceedings — subsections (a), (b), and (d) prohibit interfering with other persons in various ways. Congress could have eliminated the overlap between subsection (c) and the other existing provisions only if it completely rewrote § 1512, rather than just adding the new subsection. Congress reasonably declined to do that. Instead, Congress chose to allow overlap in several parts of the statutory scheme. *Compare* 18 U.S.C. § 1505, *with* 18 U.S.C. § 1519; *cf. Aguilar*, 515 U.S. at 616 (Scalia, J., concurring and dissenting in part) ("The fact that there is now some overlap between § 1503 and § 1512 is no more intolerable than the fact that there is some overlap between the omnibus clause of § 1503 and the other provisions of § 1503

---

against another, with intent to cause a person to withhold testimony or a record, document, or other object from an official proceeding; or with intent to cause a person to impair an object's integrity or availability in an official proceeding — or attempting to do so); § 1519 (forbidding knowingly altering, destroying, mutilating, concealing, covering up, falsifying, or making a false entry in a record, document, or tangible object with intent to impede, obstruct, or influence an investigation by, or the proper administration of, a federal department or agency).

36

itself."). Nor is the fact that overlapping subsections have different penalties a reason to contradict the plain meaning of subsection (c)(2). *See United States v. Batchelder*, 442 U.S. 114, 120–21 (1979) (finding no ambiguity in 18 U.S.C. § 924(a) even though 18 U.S.C. § 1202 "provides different penalties for essentially the same conduct," because that is "no justification for taking liberties with unequivocal statutory language.").

The district court was additionally troubled by the placement of subsection (c)(2). It reasoned that subsection (c)(2) was much broader in scope than subsections (a), (b), (c)(1), or (d), and that this "inconsistency would come in the oddest of places: in a subsection of a subsection nestled in the middle of the statute." *Miller*, 589 F. Supp. 3d at 73. Appellees similarly argue that the broad reading of § 1512(c)(2) would locate "an elephant in a mousehole." Appellees' Br. 30.

The "elephants in mouseholes" principle does not apply here. That principle recognizes that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Section 1512(c)(2) is not vague, as we have explained. Nor is it an "ancillary provision." Subsection (c) expands the scope of § 1512 to cover direct acts of obstruction. It forbids corrupt obstruction of official proceedings and is logically located within a section that enumerates obstructive offenses that affect official proceedings. And that section, in turn, sits within a Chapter dedicated to obstruction crimes. *See Yates*, 574 U.S. at 540–42 (explaining that Congress placed § 1512(c) among the statutory scheme's "broad proscriptions" that "address obstructive acts relating broadly to official proceedings and criminal trials"). As we have already discussed, the location of

37

the provision is explained by its late addition during the legislative process and its purpose of expanding liability without rewriting § 1512 in its entirety. Furthermore, we are unconcerned about the relative placement of subsections (c)(1) and (c)(2). It is common for a more specific subsection — such as the one involving documents, records, and objects — to appear first, followed by a catch-all provision. *See, e.g.*, 18 U.S.C. §§ 1503, 1505; *see also supra* Section I.A. Accordingly, we are unmoved by any claims of superfluity and "elephants in mouseholes."

**C. Lenity and Restraint**

Finally, the district court cited the principle of restraint and the rule of lenity to decline to apply § 1512(c)(2) to the alleged conduct of appellees; and appellees urge us to rely on those concepts here. Both are inapplicable.

Under the principle of restraint, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Dowling v. United States*, 473 U.S. 207, 214 (1985) (citations and internal quotation marks omitted). Similarly, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). The rule thus "applies only when a criminal statute contains a 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)); *see also United States v. Shabani*, 513 U.S. 10, 17 (1994) (explaining that the rule "applies only when,

38

after consulting traditional canons of statutory construction, we are left with an ambiguous statute."). As we have explained, the language of § 1512(c)(2) is clear and unambiguous. Restraint and lenity therefore have no place in our analysis.

\*    \*    \*

39

For all the foregoing reasons, we conclude that the district court erred in dismissing the counts charging each appellee with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2).    Appellees' alleged conduct falls comfortably within the plain meaning of "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] [an] official proceeding, or attempt[ing] to do so."    The alternative interpretations of § 1512(c)(2) proffered by the district court and appellees fail to convince us to depart from the natural reading of the statute's unambiguous text.    Accordingly, we reverse the orders of the district court, and remand for further proceedings consistent with this opinion.[8]

*So ordered.*

---

[8]    I respectfully disagree with our dissenting colleague.    The dissent does not appear to dispute that our interpretation of § 1512(c) is the most natural reading of the statute.    Rather, it relies primarily on perceived ambiguity and the rule of lenity to reject our reading.    The dissenting opinion chooses to adopt the "evidence-impairment" approach because it "has a bit of a Goldilocks quality to it — not too narrow and not too broad, but just right."    Dissenting Op. at 15.    Even assuming ambiguity, however, the dissenting opinion cites no authority — other than Goldilocks — for replacing the most natural reading of the statute with an alternative interpretation that has no basis in the statutory text but feels "just right."    *Id.*    Nor can the dissenting opinion's unorthodox methodology be justified by its goal of avoiding the broad implications of what Congress wrote in the statute.    Although the dissenting opinion cites *Bond v. United States*, 572 U.S. 844, 860 (2014), for the proposition that a statute's expansive reach can create ambiguity, Dissenting Op. at 27–28, that case does not explain why the dissent selects the atextual evidence-impairment theory over the district court's physical-evidence limitation, which is at least grounded in statutory language.

40

---

The dissenting opinion appears to be premised on a misunderstanding of the text and structure of § 1512(c). It describes § 1512(c) as containing the following type of list: "A, B, C, or otherwise D." *See* Dissenting Op. at 9–10. According to the dissent, "in ordinary English usage, the verbs preceding a residual *otherwise* clause usually *do* help narrow its meaning." *Id.* at 6 (emphasis in original). Moreover, the dissent notes, the interpretation of such a list should not change if it is punctuated differently, such as with semicolons: "A; B; C; or otherwise D." *Id.* at 10. But the structure of § 1512(c) is considerably more complicated than the dissent would have us believe. Tellingly, every example of "A, B, C, or otherwise D" proffered by the dissent involves a straightforward list of actions *or* things, followed by an "otherwise clause" that features a single, related verb or noun. *Id.* at 6 ("punches, kicks, bites, or otherwise injures"), 6–7, ("lions, tigers, giraffes, and other animals"), 11–12 ("drive . . . ; accelerate or decelerate . . . ; change lanes . . . ; cut off or tailgate other cars; yell, gesture, or make strange faces . . . ; or otherwise put us in danger . . . ."). Unlike the dissent's asserted analogies, however, § 1512(c) includes *both* a list of verbs *and* a list of objects before "otherwise," with a completely different list of verbs *and* a different type of object following "otherwise." *See* 18 U.S.C § 1512(c) ("alters, destroys, mutilates, or conceals a record, document, or other object . . .; or otherwise obstructs, influences, or impedes any official proceeding"). The actual statutory structure is therefore more like the following: "Whoever does A, B, or C to lions, tigers, or giraffes; Or otherwise does X, Y, or Z to the jungle" will suffer consequences. The dissent's insistence that § 1512(c) follows the "A, B, C, or otherwise D" pattern is puzzling, given its concession that the statute's two subsections "do not fit neatly together," making "any harmonization . . . textually awkward." Dissenting Op. at 15. The provisions of § 1512(c) are a poor fit for the dissenting opinion's extensive analysis of the simple "A, B, C, or otherwise D" formulation. Because the dissenting opinion interprets a statutory structure that is not before us, its reasoning is unconvincing.

WALKER, *Circuit Judge*, concurring in part and concurring in the judgment:

On January 6, 2021, Joseph Fischer, Edward Lang, and Garret Miller allegedly joined in that day's riot at the United States Capitol. They were indicted on multiple counts, including under 18 U.S.C. § 1512(c)(2) for "corruptly . . . obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding." The district court dismissed those counts after concluding that the Defendants' alleged conduct is not covered by (c)(2).

That was a mistake. If proven at trial, the Defendants' "efforts to stop Congress from certifying the results of the 2020 presidential election" are the kind of "obstructive conduct" proscribed by (c)(2). Lead Op. 8. I thus concur in the Court's judgment and join the lead opinion's interpretation of (c)(2)'s act element.

I do not join Section I.C.1 of the lead opinion — which declines to decide the scope of (c)(2)'s "corrupt[ ]" mental state — because I believe that we *must* define that mental state to make sense of (c)(2)'s act element. If (c)(2) has a broad act element *and* an even broader mental state, then its "breathtaking" scope is a poor fit for its place as a residual clause in a broader obstruction-of-justice statute. *See Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (reasoning that "breathtaking" scope "underscores the implausibility of the Government's interpretation").

Instead, I would give "corruptly" its long-standing meaning. It requires a defendant to act "with an intent to procure an unlawful benefit either for himself or for some other person." *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) (cleaned up). The defendant must "not only kn[ow] he was obtaining an 'unlawful benefit,'" it must also be "his 'objective' or 'purpose.'" *Id.* Read that way,

2

"corruptly" makes sense of (c)(2)'s place in the statutory scheme and avoids rendering it a vague and far-reaching criminal provision.

Those conclusions follow from five points, which I explain in the five sections below.

- The term "corruptly" has a long-established meaning at common law and in federal statutes.

- Congress often incorporates a legal term's established meaning in new legislation, and it did so when it used "corruptly" in § 1512(c).

- The statutory scheme confirms that "corruptly" carries its long-established meaning in § 1512(c).

- That interpretation avoids vagueness and ensures that the statute does not have a breathtaking scope.

- Though the meaning of "corruptly" is narrow, the indictments should still be upheld.

## I.
### "Corruptly" Has a Long-Established Meaning at Common Law and in Federal Statutes

The term "corruptly" likely originated as the mental state for common-law corruption crimes like extortion and bribery. It has since been used as a mental state in federal statutes covering bribery and obstruction of justice. In both its common-law and codified forms, "corruptly" has almost always required

3

proof that a defendant acted with an intent to procure an unlawful benefit.[1]

## A.  Common Law

The corrupt state of mind has its roots in English extortion and bribery cases.  The common law frequently employed the term "corruptly" to mean "an unlawful purpose, that is, as the purpose to give, take, receive, or accept, anything of value that is illegal or inappropriate."  Jeremy N. Gayed, *"Corruptly": Why Corrupt State of Mind Is An Essential Element for Hobbs Act Extortion under Color of Official Right*, 78 Notre Dame L. Rev. 1731, 1748 (2003).  Common-law judges looked to a defendant's corrupt mental state to differentiate "between licit

---

[1] Though the district court did not reach the meaning of "corruptly," we have no choice.  As I will explain in Sections III and IV, my vote to uphold the indictments depends on it.  Plus, the issue is squarely before us.  The Government admits that the Defendants raised the issue before the district court.  Oral Arg. Tr. 16 ("The definition of corruptly, some defendants have challenged it.  In fact, the defendants here challenged it below."); *see, e.g.*, Second Supplement to Motion to Dismiss at 9-16, *United States v. Miller*, No. 1:21-cr-00119-CJN, D.I. 59 (Nov. 15, 2021).  The Government offered its proposed definition of the term in its briefing here.  Appellant's Br. 48-51.  The Defendants responded with their own definition.  Appellees' Br. 32-36.  Then, we discussed the term's meaning with them at oral argument for around fifteen minutes.  Oral Arg. Tr. 7-16, 41-44, 66-69.  At argument, the Government asked us to "construe" "corruptly" "consistent with [its] plain language." *Id.* at 18.  The Defendants told us that "we need to interpret corruptly in this case" and that "the Court has sufficient briefing here." *Id.* at 42-43.  And we have benefited from the lengthy discussion of the issue by several district judges in similar cases. *See, e.g.*, *United States v. Sandlin*, 575 F. Supp. 3d 16, 29-34 (D.D.C. 2021) (Friedrich, J.); *United States v. Montgomery*, 578 F. Supp. 3d 54, 80-85 (D.D.C. 2021) (Moss, J.).

4

and illicit conduct" in a way that "limited the scope of extortion and bribery in a principled manner." *Id.* at 1736; *see, e.g.*, *R v. Young & Pitts* (1758) 97 Eng. Rep. 447, 450.

That was no mean feat in Tudor and Stuart England. Back then, the English legal system "lack[ed] well-defined rules about what . . . officials may take or request" from the public. Gayed, *supra*, at 1736. Officials were allowed to finance their own salaries by charging fees to the public. *Id.* at 1735-38. But they could not *knowingly* charge more than the customary amount. *Id.* So even if an official overcharged, his guilt depended on his state of mind. *Id.*

Thus, in extortion cases, courts considered whether an official had exacted an unlawful benefit — that is, a benefit to which he *knew* he was unentitled. *Id.* For example, in *R v. Seymour*, three justices of the peace were convicted for charging ten times the customary amount for a license to run an alehouse. (1740) 87 Eng. Rep. 1305, 1306. The "extraordinary manner" of the justices' overcharging, plus the fact that they had charged the proper rate in other instances, indicated that they had knowingly abused the "discretionary power" that was "reposed in [them] by the Legislature." *Id.*; *see also R v. Williams* (1762) 97 Eng. Rep. 851 (officials were liable "not for the mere refus[al] to grant the licenses . . . but for the corrupt motive of such refusal; . . . because the persons applying for them would not give their votes for members of Parliament as the [officials] would have had them").

Similarly, in bribery cases, the mere payment of a fee to an official for a benefit was not enough — the bribe payer had to know he was seeking an unlawful benefit. One striking example is *R v. Vaughan* (1769) 98 Eng. Rep. 308, 308-10. Vaughan wanted a Supreme Court (of Jamaica) clerkship. So he bribed the Duke of Grafton. The court noted that it was not

5

"criminal or dishonourable, to sell offices which are saleable."
*Id.* at 310. But Vaughan was still liable for bribery because the
clerkship was under the control of the King, not the Duke. *Id.*
So Vaughan had intended the payment "to tempt the duke to
betray [the King's] trust, by giving his advice to the King un-
der . . . a corrupt motive." *Id.*; *see also* Gayed, *supra*, at 1746-
47 (discussing *Vaughan*).[2]

When early state courts adopted the common law, they
shared their English cousins' understanding that bribery and
extortion required an intent to procure an unlawful benefit. The
Supreme Court of Pennsylvania thus refused to hold an official
liable for charging concededly "illegal" fees because he lacked
"criminal intentions." *Respublica v. Hannum*, 1 Yeates 71, 74
(Pa. 1791). And in *Cleaveland v. State*, the Supreme Court of
Alabama rejected the argument that an official could be held
liable for making unlawful charges without knowledge that
they were illegal. 34 Ala. 254, 259 (1859). To be liable, it
held, officers must "intentionally charge and take fees which
they know at the time they are not authorized to collect." *Id.*
That purpose "constitutes the corrupt intent which is the es-
sence of the offense." *Id.*; *see also Runnells v. Fletcher*, 15
Mass. 525, 526 (1819) (officer must "willfully and corruptly

---

[2] Later treatises show the stability of the mental state required for
corruption crimes at common law. In 1897 — more than 100 years
after *Seymour*, *Williams*, and *Vaughan* — one treatise explained that
extortion was the purposeful "taking of unlawful fees" and that it was
a complete defense if the official "had ground to believe and did be-
lieve that he was justified in taking the fees he received." 2 Emlin
McClain, *Treatise on the Criminal Law as Now Administered in the
United States* 130 (1897); *see also* Clark & Marshall, *A Treatise on
the Law of Crimes* 795 (6th ed. 1958) ("To constitute extortion at
common law, and very generally under the statutes, there must be a
*corrupt* intent.") (emphasis added); Gayed, *supra*, at 1743-44 (col-
lecting treatises).

6

demand[ ] and receive[ ] other or greater fees than the law allows").[3]

To sum up, the "corrupt" state of mind developed in classic crimes of corruption, like extortion and bribery. And common-law courts almost always treated the intent to procure an unlawful benefit — that is, the intent to procure a benefit which the offender *knows* is unlawful — as a crucial part of the "cluster of ideas" that defined it as a unique mental state. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) (legal "terms of art" often carry a "cluster of ideas" from "centuries of practice").

## B. Federal Statutes

The "corrupt" state of mind eventually made its way from the common law to federal statutes. Just like the common law, those statutes almost always require proof that the defendant acted with an intent to procure an unlawful benefit.

### 1. *Bribery Statutes*

Unsurprisingly, "corruptly" appears in federal bribery statutes. For example, 18 U.S.C. § 201 — titled "Bribery of public officials and witnesses" — imposes penalties on anyone who

---

[3] Modern legal dictionaries confirm that understanding. *See, e.g.*, Corruptly (def. 2), *Black's Law Dictionary* (11th ed. 2019) ("As used in criminal-law statutes, *corruptly* usu[ally] indicates a wrongful desire for pecuniary gain or other advantage."). As do some state statutes. *See, e.g.*, California Penal Code § 7(3) ("The word 'corruptly' imports a wrongful design to acquire or cause some pecuniary or other advantage to the person guilty of the act or omission referred to, or to some other person."); 21 Oklahoma Stat. § 94 ("The term 'corruptly' . . . imports a wrongful design to acquire some pecuniary or other advantage . . . .").

7

"corruptly gives, offers or promises anything of value to any public official . . . with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A); *see also* 18 U.S.C. § 215(a) (criminalizing "corruptly . . . promis[ing] anything of value . . . with the intent to influence" a transaction with a financial institution).

Courts have interpreted "corruptly" in § 201 to require an intent to secure an unlawful benefit.  There, "corruptly" means to act with a particular kind of "unlawful purpose" — a defendant must intend that the bribe be part of a "quid pro quo." *United States v. Tomblin*, 46 F.3d 1369, 1379-80 (5th Cir. 1995).  Bribes must be "made with criminal intent that the benefit be received by the official as a quid pro quo for some official act, pattern of acts, or agreement to act favorably to the donor when necessary." *United States v. Head*, 641 F.2d 174, 180 (4th Cir. 1981) (cleaned up); *see also United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (the "agreement" between a bribe payer and a bribe receiver "must include a quid pro quo — the receipt of something of value in exchange for an official act") (cleaned up).

In other words, the unlawful purpose required under § 201 is an intent to obtain an illegal benefit.  A bribe payer must intend to secure a benefit from the bribe taker and vice versa.

## 2. *Obstruction-of-Justice Statutes*

"Corruptly" is also used as a mental state in federal obstruction-of-justice statutes.

In some obstruction statutes, courts have interpreted "corruptly" to expressly require an intent to procure an unlawful benefit.  For example, 26 U.S.C. § 7212(a) imposes penalties on anyone who "corruptly" obstructs the administration of the

8

Internal Revenue Code.   There is "a consensus among the courts of appeals that 'corruptly,' as used in section 7212(a), means acting with an intent to procure an unlawful benefit either for the actor or for some other person."   *United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014) (collecting cases); *see also Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (not disputing the government's argument that "corruptly" in § 7212(a) means "the specific intent to obtain an unlawful advantage") (cleaned up).

In other obstruction statutes, the connection between "corruptly" and the defendant's intent to procure an unlawful benefit is implicit.   Take 18 U.S.C. § 1503, which imposes penalties on anyone who "corruptly" obstructs a federal juror or judicial officer.   18 U.S.C. § 1503(a).   Courts have interpreted "corruptly" there to mean an "improper purpose" — with no mention of an intent to secure an unlawful benefit.   *See, e.g.*, *United States v. Fasolino*, 586 F.2d 939, 941 (2d Cir. 1978) (cleaned up); *United States v. Haas*, 583 F.2d 216, 220 (5th Cir. 1978) ("'corruptly' means for an improper motive"); *but see United States v. Brenson*, 104 F.3d 1267, 1281 (11th Cir. 1997) (concluding that "corruptly" in § 1503 requires an intent to procure an unlawful benefit).

But that is because *all* violators of § 1503 are nearly guaranteed to gain an unlawful benefit.   An attempt to obstruct a juror is almost always an attempt to secure a favorable verdict. 18 U.S.C. § 1503.   So there is no need, in § 1503, to expressly require proof of an intent to secure an unlawful benefit.   A general improper purpose is enough.

Justice Scalia said as much in *United States v. Aguilar*, 515 U.S. 593, 616-17 (1995) (Scalia, J., concurring).   Though he recognized that "corruptly" historically "denotes an act done with an intent to give some advantage inconsistent with official

9

duty," he noted that under § 1503 "[a]cts specifically intended
to influence, obstruct, or impede, the due administration of jus-
tice . . . are necessarily corrupt." *Id.* (cleaned up).

Judge Silberman made the same point when he interpreted
the word "corruptly" in a closely related provision, 18 U.S.C.
§ 1505. *United States v. North*, 910 F.2d 843, 939-46 (D.C.
Cir. 1990) (Silberman, J., concurring in part). He stopped short
of accusing other courts of erring when they defined "cor-
ruptly" to mean an "intent to obstruct," but only because "those
opinions . . . express the view that *any* endeavor to obstruct a
judicial proceeding is inherently . . . corrupt." *Id.* at 940-41.
To avoid confusion, he would have defined "corruptly" to re-
quire inquiry into "whether the defendant was attempting to se-
cure some advantage for himself or for others that was im-
proper." *Id.* at 944.[4]

But when an obstruction provision sweeps up a broad
range of conduct, it is problematic to leave implicit the long-
established requirement that a defendant acts "corruptly" only
when he seeks to secure an unlawful benefit.

That explains why courts have interpreted "corruptly" in
26 U.S.C. § 7212(a) — the tax obstruction statute — to ex-
pressly require an intent to procure an unlawful benefit. For
example, in *United States v. Reeves*, the Fifth Circuit refused
to interpret "corruptly" in § 7212(a) to require only an "im-
proper motive," as it did in § 1503. 752 F.2d 995, 998 (5th Cir.
1985). It reasoned that under § 1503, obstructing a juror "will

---

[4] Congress has since amended the criminal code to give "corruptly"
a unique definition in § 1505, requiring only "an improper purpose."
*See* 18 U.S.C. § 1515(b). But as Judge Silberman pointed out, vio-
lating § 1505 may be "inherently . . . corrupt." *North*, 910 F.2d at
941.

10

almost necessarily result in an improper advantage to one side in the case." *Id.* at 999.  By contrast, § 7212(a)'s prohibition on obstructing the administration of the tax code covers conduct that does "not concern a proceeding in which a party stands to gain an improper advantage." *Id.* So in § 7212(a), "corruptly" should be read to include "an intent to secure an unlawful advantage or benefit." *Id.* at 1001.  That way, § 7212(a) is "substantially similar in result to" other crimes in which the term "corruptly" appears. *Id.*

The lesson from the obstruction-of-justice caselaw is clear. Either explicitly or implicitly, "corruptly" requires an intent to procure an unlawful benefit.  And the more conduct an obstruction statute reaches, the more vigilantly we must apply the long-established (and relatively narrow) meaning of "corruptly."  Otherwise we risk giving criminal provisions an implausibly broad scope, and we reduce "corruptly" to a synonym for another established mental state — "willfully." *See Marinello*, 138 S. Ct. at 1114 (Thomas, J., dissenting) (distinguishing "willfully" and "corruptly").[5]

_____

[5] The dissenting opinion says a defendant can act "corruptly" only if the benefit he intends to procure is a "financial, professional, or exculpatory advantage."  Dissenting Op. 35.  I am not so sure. *Cf. United States v. Townsend*, 630 F.3d 1003, 1010-11 (11th Cir. 2011); *United States v. Girard*, 601 F.2d 69, 70 (2d Cir. 1979); *Trushin v. State*, 425 So.2d 1126, 1130-32 (Fla. 1982).  Besides, this case may involve a professional benefit.  The Defendants' conduct may have been an attempt to help Donald Trump unlawfully secure a professional advantage — the presidency.  Like the clerkship that Samuel Vaughan corruptly sought hundreds of years ago, the presidency is a coveted professional position. *See Vaughan* (1769) 98 Eng. Rep. at 308-10; *but see* Telegram from William T. Sherman to Republican National Convention (1884) ("I will not accept if nominated, and will not serve if elected.").

11

## II.

### Congress Incorporated the Established Meaning of "Corruptly" in § 1512(c)

That brings us back to the statute at issue in this case: 18 U.S.C. § 1512(c)(2).  Recall that it penalizes a person who "*corruptly* . . . obstructs, influences, or impedes any official proceeding."  18 U.S.C. § 1512(c)(2) (emphasis added).  Our task is to interpret the words of the statute, including "corruptly," "consistent with their ordinary meaning at the time Congress enacted the statute."  *See Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up).

Here, the long-established meaning of "corruptly" at common law and in federal statutes makes our task easier.  It is a "cardinal rule" of statutory interpretation that when "Congress borrows terms of art" with a meaning elucidated during "centuries of practice," it adopts the "cluster of ideas that were attached to each borrowed word."  *Molzof v. United States*, 502 U.S. 301, 307 (1992) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

That rule has force where, as here, "Congress used an unusual term [with] a long regulatory history in [a particular] context."  *George v. McDonough*, 142 S. Ct. 1953, 1959 (2022).

---

True, the Defendants were allegedly trying to secure the presidency for Donald Trump, not for themselves or their close associates.  But the beneficiary of an unlawful benefit need not be the defendant or his friends.  Few would doubt that a defendant could be convicted of corruptly bribing a presidential elector if he paid the elector to cast a vote in favor of a preferred candidate — even if the defendant had never met the candidate and was not associated with him.  *See* Oral Arg. Tr. 18-19, *Chiafalo v. Washington*, 140 S. Ct. 2316 (2020) (discussing the fear that electoral college voters might one day be bribed).

12

From Tudor England to state courts to federal statutes, "corruptly" has almost always referred to a criminal intent to procure an unlawful benefit. Its "history . . . resolves any ambiguity" about its meaning. *Hall v. Hall*, 138 S. Ct. 1118, 1125-28 (2018) (a word's consistent use for 125 years meant that Congress "carried forward" its meaning). So when Congress used "corruptly" in § 1512(c), an ordinary, informed reader would have understood it to mean what it had meant in similar contexts for several hundred years.

True, that interpretation is narrower than the colloquial meaning of "corruptly" in other contexts. *See* Lead Op. 17. But "[s]tatutory language need not be colloquial." *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring). Rather, when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George*, 142 S. Ct. at 1959 (cleaned up).[6]

If Congress had wanted to disavow the "old soil" attached to the term "corruptly," it could have. *Id.* In fact, it expressly assigned an unusually broad definition to "corruptly" for

---

[6] The lead opinion cites *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005), as evidence that "corruptly" may carry its colloquial meaning in § 1512. Lead Op. 17. But the Court in *Arthur Andersen* merely decided that "corruptly" requires "consciousness of wrongdoing" and noted that "[t]he outer limits of this element need not be explored here because the jury instructions at issue simply failed to convey the requisite consciousness of wrongdoing." 544 U.S. at 706.

13

§ 1505.  *See* 18 U.S.C. § 1515(b) (defining "corruptly . . . [a]s used in section 1505").  But it has not done so for § 1512(c).[7]

Thus, "corruptly" in § 1512(c) means to act "with an intent to procure an unlawful benefit either for [oneself] or for some other person."  *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) (cleaned up).  It "requires proof that the defendant not only knew he was obtaining an 'unlawful benefit' but that his 'objective' or 'purpose' was to obtain that unlawful benefit."  *Id.*  And that benefit may be unlawful either because the benefit itself is not allowed by law, or because it was obtained by unlawful means.  *Id.*

### III.
### The Statutory Scheme Confirms that Congress Intended "Corruptly" to Have Its Established Meaning

The "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (cleaned up).  Giving "corruptly" its long-established meaning makes sense of § 1512's statutory scheme.  A broader reading does not.

Start with the structure of § 1512.  Titled "[t]ampering with a witness, victim, or an informant," it lists obstruction offenses of varying seriousness.  Subsection (a) prohibits killing or otherwise using physical force with the intent to prevent

---

[7] For § 1505, Congress has defined "corruptly" to require only "an improper purpose."  18 U.S.C. § 1515(b).  But, as discussed earlier, *see supra* n.4, it may still be the case that violating § 1505 with an improper purpose is "inherently . . . corrupt," *United States v. North*, 910 F.2d 843, 941 (D.C. Cir. 1990) (Silberman, J., concurring in part).

14

attendance at an official proceeding.  Subsection (b) criminal-
izes "knowingly us[ing] intimidation, threat[s], or corrupt[ ]
persuas[ion]" to "influence, delay, or prevent" testimony at an
official proceeding.  And subsection (d) penalizes intentional
harassment to dissuade attendance or testimony at an official
proceeding.

Subsection (c) was a late-game addition to the statute.
Congress enacted it to strengthen existing obstruction-of-jus-
tice laws in the wake of the Enron accounting-fraud scandal.
*See Yates v. United States*, 574 U.S. 528, 532-36 (2015) (dis-
cussing the history of the 2002 Sarbanes-Oxley Act).  That sub-
section has two parts: (c)(1) prohibits "corruptly" altering or
destroying a "document, or other object . . . with the intent to
impair the object's integrity or availability for use in an official
proceeding"; (c)(2) is a residual clause, making it an offense to
"corruptly" "otherwise obstruct[ ], influence[ ], or impede[ ]
any official proceeding."

Subsection (c)(2)'s inconspicuous place within the statu-
tory scheme suggests that it is an odd place for Congress to hide
a far-reaching criminal provision.  *See Whitman v. American
Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001).  As the
district court put it, "a reader would not expect to find in a stat-
ute that is otherwise narrowly (and consistently) tailored a
criminal prohibition of exceptionally broad scope."  *United
States v. Miller*, 589 F. Supp. 3d 60, 73 (D.D.C. 2022).  Yet
that is the result if (c)(2) does not have a carefully-tailored men-
tal state.

By contrast, giving "corruptly" its long-standing meaning
addresses those concerns.  Subsection (c)(2) is not an elephant
in a mousehole because it is no elephant.  *Cf. Whitman*, 531
U.S. at 468 ("Congress . . . does not . . . hide elephants in
mouseholes.").      Even though (c)(2) has a broad act

15

element — there are many ways to obstruct, influence, or impede an official proceeding — its mental state keeps it in check: A defendant is liable only if he intends to procure an unlawful benefit.

The need for a defendant to intend to procure an unlawful benefit means that § 1512(c)(2) will not cover the "large swaths of advocacy, lobbying and protest" that it otherwise might. *Cf.* Dissenting Op. 33. A defendant must intend to obtain a benefit that he *knows* is unlawful. *See Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting). Thus, someone who believes that picketing outside of a Justice's home is a legitimate form of protest may be guilty of a crime. *See* 18 U.S.C. § 1507. But even if the protester intended to influence the Justice's vote in an upcoming case, he would not be guilty of "corruptly . . . influenc[ing] . . . an official proceeding" unless he *knew* that his picket was unlawful. 18 U.S.C § 1512(c)(2).

To illustrate how "corruptly" limits the reach of § 1512(c)(2), consider how it might apply to a hypothetical rioter on January 6th. This rioter joined the throng outside Congress because he was angry at the nation's elites. He saw the riot as an opportunity to display his bravado. Though likely guilty of other crimes, he did not act "corruptly" under (c)(2) because he did not intend to procure a benefit by obstructing the Electoral College vote count. That rioter may not be representative of most rioters on January 6th. But in every case, the Government will need to prove at trial whether each defendant acted "corruptly" in a way that my hypothetical rioter did not.

Plus, the long-established definition of "corruptly" does more than just narrow (c)(2)'s reach. It also helps make sense of its place as a residual clause within an obstruction-of-justice statute. Obstruction provisions generally deal with activities

16

that secure an unlawful advantage. *United States v. Aguilar*, 515 U.S. 593, 616-17 (1995) (Scalia, J., concurring); *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir. 1985). Giving "corruptly" its long-established meaning ensures that (c)(2) is no different, thus giving it an essential link to its neighboring provisions.

That reading of "corruptly" also reduces the degree of overlap between (c)(2) and other provisions within § 1512. *See Miller*, 589 F. Supp. 3d at 73 (arguing that a broad reading of § 1512(c)(2) would make the rest of § 1512 "unnecessary"). For example, a defendant who "intentionally harasses another person and thereby hinders . . . any person from . . . attending or testifying in an official proceeding," 18 U.S.C. § 1512(d)(1), might satisfy the act elements of both subsection (d)(1) and subsection (c)(2) (obstructing an official proceeding). But he would not necessarily have the mental state for both crimes. Whereas (d)(1) looks only to whether the defendant "intentionally harasse[d] another person," (c)(2) requires an intent to procure an unlawful benefit. That latter mental state is considerably narrower and helps explain a large sentencing disparity between both provisions. *Compare* 18 U.S.C. § 1512(c) ("not more than 20 years") *with* § 1512(d) ("not more than 3 years"); *see also United States v. North*, 910 F.2d 843, 941 (D.C. Cir.) (Silberman, J., concurring in part) (it "makes no sense to construe" the term "corruptly" to "mean only that one must do [an act] with . . . intent"). Of course, the mental states may sometimes overlap, but a degree of "redundancy" is common in the criminal law. *Marinello*, 138 S. Ct. at 1114 (Thomas, J., dissenting).

The dissent has a different approach to addressing the structural issues raised by a broad interpretation of § 1512(c)(2). Rather than focusing on (c)(2)'s mental state, the dissent's solution is to confine the act element "to conduct that

17

impairs the integrity or availability of evidence." Dissenting Op. 38. Unlike the district court, which said (c)(2) just covers physical evidence, the dissent seems to acknowledge that impairment of any evidence could suffice, including witness testimony. *Compare Miller*, 589 F. Supp. 3d at 71, 78 *with* Dissenting Op. 21. Though the dissent admits that its interpretation does not resolve every structural problem, it claims that it creates "substantially less" surplusage. Dissenting Op. 23.

With respect, I disagree. The dissent's reading of § 1512(c)(2) runs into many of the same surplusage problems that it accuses the lead opinion's interpretation of creating.

Start with § 1512(c). On the dissent's reading, (c)(1) is surplusage. That's because the dissent's interpretation of (c)(2)'s act element covers the conduct prohibited by (c)(1): "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object." 18 U.S.C.§ 1512(c)(1).

Next zoom out and consider the rest of § 1512. Again, the dissent's reading creates significant surplusage. Because its interpretation of (c)(2) covers "conduct that impairs the integrity or availability of evidence," Dissenting Op. 38, it sweeps up the same conduct prohibited by the following provisions:

- Subsections 1512(a)(1)(A) and (a)(1)(B), which prohibit killing a person "with intent to . . . prevent the attendance or testimony of any person . . . [or] prevent the production of a record, document, or other object, in an official proceeding."

- Subsection 1512(b)(1), which criminalizes "us[ing] intimidation, threat[s], or corruptly persuad[ing] another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

18

- Subsection 1512(d)(1), which penalizes "intentionally harass[ing] another person and thereby hinder[ing] . . . any person from . . . attending or testifying in an official proceeding."

That overlap creates odd outcomes. For instance, on the dissent's reading, anyone convicted of harassing and hindering a witness under (d)(1) could also be convicted under (c)(2) — despite the 17-year sentencing disparity between the two. *Compare* 18 U.S.C. § 1512(c) ("not more than 20 years") *with* § 1512(d) ("not more than 3 years").

By contrast, my narrow reading of (c)(2)'s mental state avoids some of the overlap with those provisions. Unlike (c)(2), those provisions all require a type of specific intent. 18 U.S.C. § 1512(a)(1) (intent to obstruct), (a)(2) (same), (b) (knowingly using intimidation with intent to obstruct), (d) (intent). By contrast, (c)(2) requires a defendant to act "corruptly" — a much narrower mental state than "intent" or "knowledge." *See North*, 910 F.2d at 940-41 (Silberman, J., concurring in part).

True, my definition of "corruptly" does not avoid surplusage entirely. As the dissent notes, failing to limit § 1512(c)'s act element to evidence impairment would render parts of § 1503 (corruptly influencing or injuring a juror or court officer) and § 1505 (corruptly obstructing proceedings pending before Congress or executive agencies) superfluous. Dissenting Op. 20. But again, a degree of "redundancy" is common in the criminal law. *Marinello*, 138 S. Ct. at 1114 (Thomas, J., dissenting). And the canon avoiding "surplusage is strongest when an interpretation would render superfluous another part of the *same* statutory scheme." Dissenting Op. 17 (quoting

19

*Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013))
(emphasis added).

Though no interpretation of § 1512(c) fixes every struc-
tural issue, the long-established definition of "corruptly" fixes
many of the surplusage issues within § 1512. The dissent's in-
terpretation of (c)(2)'s act element does not.[8]

## IV.
## That Interpretation Avoids Vagueness and Ensures That § 1512(c)(2) Does Not Have a Breathtaking Scope

An innovatively broad definition of "corruptly" could raise
serious concerns that § 1512(c)(2) is a vague provision with a
breathtaking scope. For instance, if "corruptly" requires proof
only that a defendant acted with a "wrongful purpose," then
(c)(2) might criminalize many lawful attempts to "influence[ ]"
congressional proceedings — protests or lobbying, for exam-
ple. Appellees' Br. 34 (quoting § 1512(c)(2)).

Reading "corruptly" to require more than a "wrongful pur-
pose" avoids that problem. A lobbyist who persuades a con-
gressman to ask hard questions at a committee hearing has in-
fluenced the proceeding, but he has not sought to gain an *un-
lawful* benefit. *Cf. United States v. North*, 910 F.2d 843, 941-
42 (D.C. Cir. 1990) (Silberman, J., concurring in part) (because
"corruptly" limited the reach of § 1505, it prevented the statute
from "convert[ing] all of Washington's office buildings into
prisons"). "Vigorously apply[ing]" (c)(2)'s mental-state pro-
vision thus "protect[s] criminal defendants" by making it

---

[8] As I have explained, I disagree with the dissenting opinion's inter-
pretation of § 1512(c)(2)'s act element. But I do not join footnote 8
of the lead opinion, which explains its own reasons for disagreeing
with the dissent.

20

harder for law abiding people to unwittingly commit a federal crime. *Wooden v. United States*, 142 S. Ct. 1063, 1076 (2022) (Kavanaugh, J., concurring) (mental-state requirements "are 'as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil'" (quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952))).

Finally, reading "corruptly" to impose a stringent mental state heeds the "unmistakable" message from the Supreme Court that "[c]ourts should not assign federal criminal statutes a 'breathtaking' scope when a narrower reading is reasonable." *United States v. Dubin*, 27 F.4th 1021, 1041 (5th Cir. 2022) (Costa, J., dissenting) (quoting *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021)). "In the last decade, it has become nearly an annual event for the Court to give this instruction." *Id.*[9] We should not make the Court repeat itself by refusing to give "corruptly" its narrow, long-established meaning here.

## V.
## The Indictments Should be Upheld

Even under the proper, narrow reading of "corruptly," the indictments should be upheld. Each contains "the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). That's because they allege that the Defendants

---

[9] *See Van Buren*, 141 S. Ct. at 1661; *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020); *Marinello v. United States*, 138 S. Ct. 1101, 1107 (2018); *McDonnell v. United States*, 579 U.S. 550 (2016); *Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality op.); *Bond v. United States*, 572 U.S. 844, 863 (2014); *Skilling v. United States*, 561 U.S. 358, 410-11 (2010); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005).

21

"corruptly obstruct[ed], influence[d], and impede[d] an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote." JA 444 (Fischer); *see also* JA 55 (Lang); JA 85-86 (Miller).

Of course, the Government must prove its allegations at trial. It must show that the Defendants "corruptly" obstructed the certification of the Electoral College vote. That is not outside the realm of possibility. For example, it might be enough for the Government to prove that a defendant used illegal means (like assaulting police officers) with the intent to procure a benefit (the presidency) for another person (Donald Trump).

\* \* \*

When used as a criminal mental state, "corruptly" is a term of art that requires a defendant to act with "an intent to procure an unlawful benefit either for himself or for some other person." *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) (cleaned up). That meaning has been recognized in similar contexts by Justice Thomas, Justice Scalia, and Judge Silberman. *Id.*; *United States v. Aguilar*, 515 U.S. 593, 616-17 (1995) (Scalia, J., concurring); *United States v. North*, 910 F.2d 843, 939-46 (D.C. Cir. 1990) (Silberman, J., concurring in part); *see also United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014) (collecting cases from nine other circuits). And in this context, for § 1512(c), the statutory text and structure confirm that "corruptly" has its long-established meaning. Reading it that way reconciles (c)(2) with the statutory scheme, avoids vagueness, and heeds the Supreme Court's warning to beware of interpretations that impose onto criminal statutes a "breathtaking" scope. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

22

Because I read "corruptly" as courts have read it for hundreds of years — and *only* because I read it that way — I concur in the Court's judgment.[10]

---

[10] In other words, my reading of "corruptly" is necessary to my vote to join the lead opinion's proposed holding on "obstructs, influences, or impedes" an "official proceeding." 18 U.S.C. § 1512(c)(2). If I did not read "corruptly" narrowly, I would join the dissenting opinion. That's because giving "corruptly" its narrow, long-established meaning resolves otherwise compelling structural arguments for affirming the district court, as well as the Defendants' vagueness concerns. See *supra* Sections III & IV.

My reading of "corruptly" may also be controlling, at least if a future panel analyzes this splintered decision under *Marks v. United States* — the test for deciding the holding of a fractured Supreme Court judgment. 430 U.S. 188, 193 (1977); *see also Binderup v. Attorney General*, 836 F.3d 336, 356 (3d Cir. 2016) (en banc) (applying *Marks* to determine the "law of [the] Circuit").

Where, as here, "no single rationale explaining the result enjoys the assent of [a majority]" — and again, in my view, the rationale in the lead opinion is not enough to uphold the indictments — *Marks* says the court's holding is the "position taken" by the judge "who concurred in the judgments on the narrowest grounds." 430 U.S. at 193. The narrowest ground is a "logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991). It is a "middle ground" that "produce[s] results that" accord with "a subset of the results" intended by each opinion. *United States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J., concurring in denial of rehearing en banc).

That describes my position here. I read (c)(2) to cover only *some* of the conceivable defendants the lead opinion might allow a court to convict. So my opinion is a "logical subset of [an]other, broader opinion[ ]." *Id.* (cleaned up). In contrast, the lead opinion suggests three plausible readings, including mine. Lead Op. 17-18. It then says the Defendants' alleged conduct is sufficient "[u]nder all *those* formulations." *Id.* (emphasis added). Though the lead opinion says

23

I also join all but Section I.C.1 and footnote 8 of the lead opinion.

---

elsewhere that it "takes *no* position on the exact meaning of 'corruptly,'" it must take *some* position on it.  Lead Op. 21 n.5.  Without taking a position, the lead opinion could not conclude, as it does, that the indictments should be upheld.

Put differently, if a defendant is guilty under my approach, he will be guilty under the lead opinion's.  But some of the defendants guilty under the lead opinion's approach will not be guilty under my approach.  Mine is the "position taken" by the panel member "who concurred in the judgment[ ] on the narrowest grounds."  *Marks*, 430 U.S. at 193.

That is not to say that a future panel will apply *Marks* to this decision.  I express no opinion about whether it should.  *Cf.* Richard M. Re, *Beyond the Marks Rule*, 132 Harv. L. Rev. 1942, 1944 (2019) ("the *Marks* rule has generated considerable confusion").  But a future panel will need *some* rule to decide the holding of today's fractured decision, and the *Marks* rule would be an unsurprising choice.  *Id.* ("'the *Marks* rule' . . . has been used with increasing regularity").

One last thing.  To the extent it matters — and it doesn't matter under *Marks* — the lead opinion and the dissent do not agree about (c)(2)'s mental state.  *Cf. Marks*, 430 U.S. at 193 (looking to the opinions of only those Justices "who concurred in the judgments on the narrowest grounds").  Rather, the dissent expressly rejects the lead opinion's approach to "corruptly," suggesting that it raises "vagueness and overbreadth concerns."  *See* Dissenting Op. 33.

KATSAS, *Circuit Judge*, dissenting:  This appeal turns on how the two subsections of 18 U.S.C. § 1512(c) interact with one another.  The first subsection addresses the preservation of physical evidence, by imposing criminal penalties on anyone who corruptly "alters, destroys, mutilates, or conceals a record, document, or other object" with an intent "to impair the object's integrity or availability for use in an official proceeding."  *Id.* § 1512(c)(1).  The second subsection is broader and less precise, imposing the same penalties on anyone who, acting corruptly, "otherwise obstructs, influences, or impedes any official proceeding."  *Id.* § 1512(c)(2).  The question presented is whether the second subsection applies to obstruction that bears no relationship to the specific acts of spoliation covered by the first subsection.

The government reads section 1512(c) as reaching all acts that corruptly obstruct or influence an official proceeding.  In its view, the catchall *otherwise* clause alone determines the scope of the provision, and the preceding examples do nothing to narrow it:  If a person corruptly obstructs an official proceeding by altering, destroying, mutilating, or concealing a record, document, or other object, the first subsection applies. And if a person corruptly obstructs an official proceeding in any other way, the second subsection applies.  Section 1512(c) thus reduces to a single provision criminalizing any act that corruptly obstructs an official proceeding.

In my view, the government's interpretation is mistaken. For one thing, it dubiously reads *otherwise* to mean "in a manner different from," rather than "in a manner similar to." For another, it reads the catch-all provision in subsection (c)(2) to render ineffective the longer, more grammatically complex list of examples in subsection (c)(1), which is inconsistent with normal linguistic usage and with several canons reflecting it. The government's reading is also hard to reconcile with the structure and history of section 1512, and with decades of precedent applying section 1512(c) only to acts that affect the

2

integrity or availability of evidence. Moreover, the government's reading makes section 1512(c) implausibly broad and unconstitutional in a significant number of its applications. Finally, if all of that were not enough, these various considerations make the question presented at least close enough to trigger the rule of lenity.

Because my colleagues reject an evidence-focused interpretation of section 1512(c) and instead adopt the government's all-encompassing reading, I respectfully dissent.

I

Joseph Fischer, Edward Lang, and Garret Miller allegedly participated in the riot at the United States Capitol on January 6, 2021, including by assaulting police officers. Such conduct would violate many criminal statutes. Among other offenses, the government charged Fischer, Lang, and Miller with assaulting federal officers, causing civil disorder, entering a restricted building, and demonstrating inside the Capitol.

The government also charged them with obstructing an official proceeding in violation of section 1512(c)(2). It argued that section 1512(c) "comprehensively" prohibits the obstruction of official proceedings, regardless of whether the obstruction has any connection to the spoliation of evidence. Gov't Response to Defendants' Joint Supp. Br., *United States v. Miller*, No. 21-cr-119 (D.D.C.), ECF Doc. 63-1 at 6. On this account, because the defendants wrongfully obstructed the proceeding to certify the vote of the Electoral College for President, they violated the provision.

The district court dismissed the section 1512(c) counts. It reasoned that subsection (c)(2) could be read either as prohibiting any act that obstructs an official proceeding or as a residual clause reaching only obstructive acts similar to the

3

ones covered by subsection (c)(1).  *See United States v. Miller*, 589 F. Supp. 3d 60, 67–72 (D.D.C. 2022).  In choosing the latter reading, the court explained that the former one would make superfluous both subsection (c)(1) and the word *otherwise*. *Id.* at 70.  The court also concluded that the structure and historical development of section 1512 support a narrower reading, as does the rule of lenity.  *Id.* at 66, 72–76.

The government appealed the dismissal.  We have jurisdiction under 18 U.S.C. § 3731.  The operative question is whether the government's allegations, if proven, would permit a jury to find that the defendants violated section 1512(c).  *See United States v. Sampson*, 371 U.S. 75, 76 (1962).

II

Section 1512(c) provides:

Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

Subsection (c)(2) consists of four elements.  First are its *actus rei* verbs—the defendant must *obstruct*, *influence*, or *impede*.  Second is the adverb *otherwise*, which qualifies the verbs by indicating some relationship between the covered

4

obstruction and the acts prohibited by subsection (c)(1). Third is the direct object—the defendant must obstruct an *official proceeding*. Fourth is a *mens rea* requirement—in obstructing an official proceeding, the defendant must act *corruptly*.

The question presented involves the *actus reus*—what counts as otherwise obstructing, influencing, or impeding an official proceeding. The literal meaning of the verbs is undisputed: They are strikingly broad, sweeping in anything that "hinders," "affects the condition of," or "has an effect on" a proceeding. *See Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (interpreting "obstruct" and "impede"); *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. And the proceeding to certify the Electoral College vote plainly qualified as an "official proceeding," which the statute defines to include "a proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1). The dispute over the *actus reus* thus boils down to the word *otherwise*.

In the analysis that follows, I will first show that the word introduces a critical ambiguity about how subsections (c)(1) and (c)(2) relate to each other. Then, I will explain why the ambiguity is best resolved in favor of the defendants' evidence-focused interpretation. Of course, these inquiries overlap considerably; the analysis of whether a proposed interpretation is at least reasonable (which would make it not unambiguously wrong) parallels the analysis of whether the interpretation is correct. But because my colleagues place so much weight on a contention that subsection (c)(2) *unambiguously* compels the government's interpretation, I will separately consider the threshold question of ambiguity.

5

III

A

"In determining the meaning of a statutory provision, we look first to its language, giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (cleaned up). Yet we do not divorce isolated words and phrases from their statutory context. Rather, "[c]ontext is a primary determinant of meaning." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012); *see United States v. Briggs*, 141 S. Ct. 467, 470 (2020) ("The meaning of a statement often turns on the context in which it is made, and that is no less true of statutory language."). As a result, "it is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Reno v. Koray*, 515 U.S. 50, 56 (1995) (cleaned up). As Justice Scalia emphasized: "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, *supra*, at 167.

Despite the centrality of this whole-text canon, the government urges us to consider nothing outside the four corners of subsection (c)(2)—not the text of subsection (c)(1); not the text of section 1512; and not the text of chapter 73 of Title 18, which sets forth obstruction-of-justice offenses including section 1512. According to the government, *otherwise* unambiguously means "in a different way" or "in another manner." *Otherwise*, Black's Law Dictionary (11th ed. 2019). So subsection (c)(1) prohibits acts that obstruct an official proceeding by impairing the integrity or availability of

6

physical evidence, and subsection (c)(2) prohibits acts that obstruct an official proceeding in any other manner. In other words, section 1512(c) covers *all* acts that obstruct an official proceeding. And the enumeration of specific obstructive acts in subsection (c)(1) creates a housekeeping question whether any individual act may be charged under subsection (c)(1) or (c)(2). But the enumeration does nothing to restrict the overall scope of section 1512(c) and its 20-year authorized sentence.

This argument has a neat reductionist logic. It can be generalized as follows: an expression of the form "*A*, *B*, *C*, or otherwise *D*"—where *A*, *B*, and *C* are examples of *D*—is equivalent to "*D*" because the word "otherwise" picks up every instance of *D* not already captured by *A*, *B*, or *C*. And so, according to the government, section 1512(c) unambiguously reduces to the words that follow *otherwise*. In this case, because the defendants obstructed an official proceeding, section 1512(c) applies. *QED*.

This logic oversimplifies. It misses the point that, in ordinary English usage, the verbs preceding a residual *otherwise* clause usually *do* help narrow its meaning. For example, if a rule punished anyone who "punches, kicks, bites, or otherwise injures" someone else, you would recognize that the examples involve physical injury, and you would understand that the residual term likewise involves a physical injury. Further, you would do so even though the dictionary defines the word *injure* to include reputational, financial, and emotional injuries. Or consider a residual clause introduced by the adjectival form *other*. If I claimed to love "lions, tigers, giraffes, and other animals," you would recognize that the examples all involve large game. You would thus understand that "animals" likely includes elephants, may include dogs, and likely excludes mice. You would certainly not think that "animals" *unambiguously* includes mice. And you would

7

deduce all this even though dictionary definitions of "animal" would be no help in distinguishing among elephants, dogs, and mice. In short, you would understand that what follows a residual "other" or "otherwise" clause is likely *similar* (though not identical) to the examples that precede it.

As these examples show, reducing a phrase of the form "*A, B, C*, or otherwise *D*" to "*D*" will likely expand its meaning. If the boundaries of "*D*" were readily ascertainable without clarification, a speaker would simply say "*D*," rather than using a longer and clunkier formulation with examples and a residual "otherwise" clause. Nobody refers to "letters that are P, S, X, or otherwise in the English alphabet," because we do not need clarifying examples to understand which letters are in the English alphabet. So, when speakers use a phrase like "*A, B, C*, or otherwise *D*," there is good reason to think that *D* is either ambiguous (as in the "injures" example above) or likely to be interpreted too broadly if not clarified by examples (as in the case of my favorite "animals"). And this point about ordinary usage is a *textual* one, for the goal of textualism is not to explore the definitional possibilities for isolated words, but to assess how "an ordinary speaker of English" would understand the phrases that Congress has strung together. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020). On this last point, there should be widespread agreement. *Compare Lockhart v. United States*, 577 U.S. 347, 351–52 (2016) (majority), *with id.* at 362 (Kagan, J., dissenting).

Not surprisingly, these linguistic points coincide with several semantic canons of construction, which track how speakers normally use English. I will have more to say about the canons below, but for now here are three of them: First, the canon against surplusage is a "cardinal principle of statutory construction" that "we must give effect, if possible, to every

8

clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up). Thus, if Congress uses a formulation like "*A*, *B*, *C*, or otherwise *D*," we should be reluctant to simplify the phrase to "*D*," which would read out of the statute the examples plus the word *otherwise*. Second and third are the related canons of *ejusdem generis* and *noscitur a sociis*. *Ejusdem generis* provides that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (cleaned up). And *noscitur a sociis*, or the associated-words canon, prescribes that "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Like the linguistic analysis above, these canons point us to the specific examples that precede the word *otherwise* to understand the more general prohibition that follows it.

B

The Supreme Court has embraced this understanding of how a residual *otherwise* phrase should be interpreted. In *Begay v. United States*, 553 U.S. 137 (2008), the Court considered what constitutes a "violent felony" under the Armed Career Criminal Act (ACCA). The operative definition extends to any crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The question presented was whether a DUI offense falls within the residual *otherwise* clause. Answering no, the Court expressed no doubt that drunk driving "presents a serious potential risk of physical injury to another," at least as those words are commonly understood.

9

But it held that the residual clause "covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'"  553 U.S. at 142.  The Court explained that "to give effect to every clause and word of th[e] statute, we should read the examples as limiting the crimes that [the residual clause] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 143 (cleaned up).  For if Congress "meant the statute to be all encompassing, it is hard to see why it would have needed to include the examples at all."  *Id.* at 142.

The Court specifically rejected the government's understanding of *otherwise*.  There as here, the government argued that because the dictionary defines it to mean "in a different manner," the residual clause must sweep in all conduct that satisfies its literal terms, regardless of the preceding statutory context.  Brief for the United States at 25–26, *Begay v. United States*, No. 06-11543 (U.S.).  Disagreeing, the Court explained that "the word 'otherwise' *can* (we do not say *must*) refer to a crime that is similar to the listed examples in some respects but different in others—similar, say, in respect to the degree of risk it produces, but different in respect to the 'way or manner' in which it produces that risk."  553 U.S. at 144 (cleaned up).  In other words, as used to introduce a residual clause following a list of examples, an *otherwise* clause is not unambiguously all-encompassing.  It can connote not only difference but also a degree of similarity, particularly where necessary to avoid reducing the examples to surplusage.

C

My colleagues do not dispute that these principles guide our interpretation of a phrase with the general form "*A*, *B*, *C*, or otherwise *D*."  Instead, they argue that section 1512(c)(2)

10

does not take that form.  They offer two distinctions, but one is immaterial and the other cuts against their position.

First, my colleagues note that ACCA and section 1512(c) are composed differently:  The ACCA definition at issue in *Begay* involved "a single, unbroken sentence within the same paragraph," whereas section 1512(c) uses "a separately numbered subparagraph, after a semicolon and line break." *Ante* at 28.  But the relationship created by the word *otherwise* does not depend on punctuation or line breaks.  Rather, as explained above, it flows from the connotation of similarity, the intuition that speakers do not deliberately waste words, and the need to give effect to every clause of a statute.  Thus, every claim made above about the phrase "*A*, *B*, *C*, or otherwise *D*" applies no less to the list

    (1) *A*;
    (2) *B*;
    (3) *C*; or
    (4) otherwise *D*.

Other decisions reinforce the primacy of text over punctuation or line breaks. In *United States v. O'Brien*, 560 U.S. 218 (2010), the Court held that Congress, by moving part of a statutory paragraph into a separate subparagraph, did not transform the shifted text from an offense element into a sentencing factor.  The Court reasoned that a "more logical explanation for the restructuring" was simply to break up the paragraph "into a more readable statute," as recommended by modern legislative drafting guidelines.  *Id.* at 233–34.  The cited guidelines suggest that text be broken into subsections and subparagraphs "[t]o the maximum extent practicable." House Legislative Counsel's Manual on Drafting Style, HLC No. 104.1, § 312 at 24 (1995); *see* Senate Office of the Legislative Counsel, Legislative Drafting Manual § 112 at 9–

11

11 (1997).  *O'Brien* thus confirms that we should not elevate Congress's drafting style—especially a choice to divide statutes into smaller subdivisions—over the text it enacted.[1]

Second, the lead opinion invokes the "complicated" structure of section 1512(c).  To begin, it notes the length and grammatical complexity of the examples preceding the word *otherwise*.  *Ante* at 40 n.8.  But it draws the wrong inference from this complexity.  The long, reticulated list of examples in subsection (c)(1) makes it even more implausible that subsection (c)(2) would render them meaningless.

Consider another pair of hypotheticals.  Suppose a companion and I are setting off to a mountaineering adventure.  If my partner says, "Please don't drive too fast or otherwise put us in danger during this trip," I will have difficulty discerning whether "otherwise put us in danger" is meant to be all-encompassing (*i.e.*, covering both driving and mountaineering hazards) or limited to dangerous driving besides speeding.  But suppose my partner says: "Please don't drive too fast; accelerate or decelerate suddenly and without warning; change lanes without signaling; cut off or tailgate other cars; yell, gesture, or make strange faces at other drivers or their passengers; or otherwise put us in danger during this trip."  In that case, I will have no doubt that the *otherwise* clause refers

---

[1] Of course, statutes with semicolons and line breaks sometimes do define unrelated offenses.  *Loughrin v. United States*, 573 U.S. 351 (2014), involved such a statute.  It imposed criminal penalties on anyone who knowingly schemes (1) to defraud a financial institution or (2) to obtain property owned by a financial institution through false pretenses.  18 U.S.C. § 1344.  Interpreting these clauses as operating independently, the Court rejected an argument that the second clause requires proof of intent to defraud.  573 U.S. at 355.  But section 1344 lacked the key word—*otherwise*—that textually links the two subsections in section 1512(c).

12

only to driving hazards. The reason is plain: A speaker would not waste time and effort enumerating a reticulated list only to render it meaningless with a catchall that subsumes and is not delimited by the list. The longer and more complex the list of examples preceding the word *otherwise*, the stronger the case for giving the residual clause a contextual rather than all-encompassing interpretation.

The lead opinion further invokes the complexity of the words following *otherwise*. It conjures up this clause: "Whoever does A, B, or C to lions, tigers, or giraffes; Or otherwise does X, Y, or Z to the jungle." *Ante* at 40 n.8. It sounds strange because the actions one might take against lions, tigers, or giraffes are so different from the actions one might take against a jungle. It is thus hard to think of the words preceding "otherwise" as setting forth examples of what follows. Precisely because "otherwise" cannot bear its usual connotation of "different from but similar to," the entire sentence sounds off. Section 1512(c) is not composed like that: Match any of the four verbs in subsection (c)(1) (*alter*, *destroy*, *mutilate*, or *conceal*) with any of its three direct objects (a *record*, *document*, or *other object*) and you will come up with a paradigmatic example of obstructing, influencing, or impeding an official proceeding. In other words, despite the grammatical complexity of the words preceding and following *otherwise*, it is easy to recognize the preceding words as setting forth examples of what follows. And that makes section 1512(c) much closer to my stylized "*A*, *B*, *C*, or otherwise *D*" formulation—and to the actual ACCA text construed by the Supreme Court in *Begay*—than it is to the exceedingly odd clause formulated by the lead opinion.[2]

---

[2]    My colleagues cite two lower-court decisions construing statutes with a residual *otherwise* clause. *Ante* at 12. Both cases invoked the residual clause to support a broad interpretation of a

13

D

How do these general principles apply to section 1512(c)? Without the line break, its *actus reus* covers anyone who "(1) alters, destroys, mutilates, or conceals a record, document, or other object, … with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding." The parties and the district court have proposed three different readings of subsection (c)(2), based on three different inferences about the relevant similarity through which *otherwise* connects the two subsections.

As noted above, the government reads *otherwise* to mean "in any other way." On this view, the only relevant similarity between the two subsections is that both address obstructing, influencing, or impeding an official proceeding. Thus, subsection (c)(1) does not operate to narrow subsection (c)(2), which effectively swallows up subsection (c)(1).

In contrast, the district court and the defendants read *otherwise* to require some further similarity between the obstruction covered by subsection (c)(2) and the specific acts covered by subsection (c)(1). But what is the relevant criterion of similarity? The district court read section 1512(c) as focused on the preservation of *physical evidence*, consistent with the string of nouns ("record, document, or other object") in subsection (c)(1). It therefore held that subsection (c)(2) requires the defendant to have "taken some action with respect to a document, record, or other object in order to corruptly

---

preceding example. *Collazos v. United States*, 368 F.3d 190, 199–200 (2d Cir. 2004); *United States v. O'Hara*, 143 F. Supp. 2d 1039, 1041–42 (E.D. Wis. 2001). Neither case suggests that a residual *otherwise* clause must be untethered from the preceding illustrations.

14

obstruct, impede or influence an official proceeding." *Miller*, 589 F. Supp. 3d at 78.

For their part, the defendants read section 1512(c) as focused on the development and preservation of *evidence*, consistent with the spoliation addressed in subsection (c)(1) and with the broader tampering and obstruction provisions that appear throughout section 1512 and chapter 73. The defendants invoke the views of a distinguished commentator who summarized obstruction law this way:

> [O]bstruction laws do not criminalize just any act that can influence a "proceeding." Rather they are concerned with acts intended to have a *particular kind* of impact. A "proceeding" is a formalized process for finding the truth. In general, obstruction laws are meant to protect proceedings from actions designed to subvert the integrity of their truth-finding function through compromising the honesty of decision-makers (*e.g.*, judge, jury) or impairing the integrity or availability of evidence—testimonial, documentary, or physical.

Memorandum from Bill Barr to Deputy Att'y Gen. Rod Rosenstein & Ass't Att'y Gen. Steve Engel at 1 (June 8, 2018), http://perma.cc/CWX6-GAE9. For these reasons, the defendants urge limiting subsection (c)(2) to acts that impair the integrity or availability of evidence.

Which of these competing interpretations is best? That is a hard question, for each has some difficulties. The district court's focus on *physical evidence* finds strong textual support in subsection (c)(1), but risks making subsection (c)(2) into surplusage. What acts directed at physical evidence might obstruct, influence, or impede an official proceeding without also altering, destroying, mutilating or concealing the evidence

15

in order to impair its integrity or availability for use in an official proceeding?   Perhaps covering up, falsifying, or making false entries in the evidence, as the district court noted, *see Miller*, 589 F. Supp. 3d at 71, but that suggests an oddly narrow range of application for the broadly worded residual clause.   The defendants' focus on *evidence* preserves meaningful application for both subsection (c)(1) (which covers impairing the availability of physical evidence) and subsection (c)(2) (which, on this view, would cover impairing the availability of other kinds of evidence).   As explained below, it also accounts for all the caselaw under section 1512(c).   But a focus on evidence writ large—as opposed to physical evidence—is arguably harder to infer from subsection (c)(1)'s examples, all of which involve physical evidence.   The defendants' interpretation thus has a bit of a Goldilocks quality to it—not too narrow and not too broad, but just right.   Finally, the government's interpretation has more than its share of difficulties; as explained above, it would reduce subsection (c)(1) and the word *otherwise* to surplusage, despite *Begay*.

In fact, the two subsections do not fit neatly together, so any harmonization will be textually awkward.   But the defendants win under their interpretation or that of the district court, because the indictments do not allege that they took any action affecting physical or other evidence relevant to the Electoral College certification.   And for the reasons given above, it seems to me a stretch to say that the government's interpretation is not only the best, but so much better than the others that we can declare it unambiguously correct and call it a day without completing a full-blown statutory analysis.[3]

---

[3]  The lead opinion misreads this account.  My point here is that all three interpretations of section 1512(c)(2) have significant textual difficulties, so none is unambiguously correct.  As explained at length below, an evidence-focused reading is the best one despite its

16

My colleagues conclude that subsection (c)(2) is unambiguous because its verbs sweep broadly and its introductory word *otherwise* means "in a different manner." *Ante* at 11. But ambiguity determinations do not end with the precise text that is directly controlling in the case. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2134–38 (2016); *see Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality) ("Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words."). Instead, as the Supreme Court has stressed, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Accordingly, the ambiguity determination in this case should seek to understand section 1512(c) within its statutory context as part of section 1512 and chapter 73. And at a minimum, it should seek to harmonize the subsections of section 1512(c), which consists of a single sentence nesting two subsections between a shared *mens rea* element at the beginning and a shared penalty at the end. Finally, even if I am wrong about all of this, my colleagues err in asserting that *otherwise* unambiguously means "in a different manner"—with no consideration of any possible similarity. That mistake alone is enough to show ambiguity within the four corners of subsection (c)(2), in addition to the ambiguity arising from structural considerations about how the subsections most plausibly interact in the broader statutory context.

---

arguable Goldilocks quality—not "because" of it, *ante* at 39 n.8. And my Goldilocks quip may itself be a bit too pejorative, for one can infer an evidence-based focus from the broader text and structure of section 1512.

17

IV

Because section 1512(c) contains ambiguity, we must use all "traditional methods of statutory interpretation" to determine its best meaning. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011). As shown above, the text of section 1512(c) cuts against the government's all-encompassing interpretation, though perhaps not decisively. And so do at least seven other considerations: the presumption against surplusage, the related canons of *ejusdem generis* and *noscitur a sociis*, the structure of section 1512, the history of that section, precedent construing it, the improbable and unconstitutional breadth of the government's interpretation, and the rule of lenity.

A

As noted above, it is a "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams*, 529 U.S. at 404 (cleaned up). The government's reading of subsection (c)(2) would create three levels of problematic surplusage.

First, as explained above, it would collapse subsection (c)(1) into subsection (c)(2). Yet "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). Subsections (c)(1) and (c)(2) are not just part of the same statutory scheme; they are part of one sentence, and they share a single *mens rea* requirement and a single authorized punishment. Within a single phrase, clause, or sentence, there is no surplusage problem with collapsing recognized couplets (such as "aid and abet") or strings of near synonyms (such as "obstructs, influences, or impedes"). Such formulations indicate that "iteration is obviously afoot." *Moskal v. United States*, 498

18

U.S. 103, 120 (1990) (Scalia, J., dissenting).  But here, subsection (c)(1) is longer and more grammatically complex than subsection (c)(2).  The former consists of four verbs, three direct objects, an attempt clause, and a second intent requirement, which collectively span 32 words.  The latter consists of the critical word *otherwise*, three verbs, one direct object, and an attempt clause, which collectively span 13 words.  Given the respective length and structure of these two provisions, there is no plausible reason why Congress would enact all of section 1512(c) just to reach the conduct described after the word *otherwise* in the short, catchall subsection (c)(2).

The concurrence responds that my interpretation creates the same surplusage problem because, on my view, subsection (c)(2) still covers all the conduct prohibited by subsection (c)(1).  *Ante* at 17 (opinion of Walker, J.).  Of course, the residual term *D* in any "*A*, *B*, *C*, or otherwise *D*" formulation covers the preceding examples.  And so, under any of the three possible interpretations of section 1512(c), subsection (c)(2) covers the examples set forth in subsection (c)(1).  But on my view, the examples do meaningful work by narrowing the breadth of the residual term.  *See Begay*, 553 U.S. at 142–43.  On my colleagues' view, in contrast, the examples in subsection (c)(1) do no work at all, and section 1512(c) has the same breadth it would have if Congress had omitted all of subsection (c)(1) and the word *otherwise*.

Second, the government's reading also would collapse most of section 1512 into the subsection (c)(2) catchall.  Section 1512 sets forth 21 different offenses, and the government's reading would fold at least 15 of them into subsection (c)(2).  Here are a few random examples:  Section 1512(a)(1) prohibits killing a person to prevent his attendance at an official proceeding or to prevent the production of a record, document, or other object in an official proceeding.  18

19

U.S.C. § 1512(a)(1)(A), (B).  Section 1512(b)(1) prohibits
corruptly persuading another person to influence, delay, or
prevent testimony at an official proceeding.     Section
1512(d)(1) prohibits harassing another person to dissuade him
from attending an official proceeding.  And section 1512(d)(4)
prohibits harassing another person to prevent a criminal
prosecution.  All these acts—and the others prohibited by most
other parts of section 1512—would influence or affect an
official proceeding.[4]

This wholesale surplusage is even stranger given section
1512's graduated penalty scheme.  Section 1512(a) authorizes
terms of imprisonment of up to 30 years for various obstructive
acts involving the use of physical force, 18 U.S.C.
§ 1512(a)(3)(B), and up to 20 years for obstructive acts
involving the threat of physical force, *id.* § 1512(a)(3)(C).
Section 1512(b) authorizes terms of up to 20 years for
obstructive acts involving intimidation.  *Id.* § 1512(b).  Section
1512(d) authorizes maximum terms of only three years for
obstructive acts involving harassment.   *Id.* § 1512(d).   By
collapsing most of section 1512 into its subsection (c)(2), the
government's interpretation would lump together conduct
warranting up to three decades of imprisonment with conduct

---

[4] The 15 provisions that would collapse into subsection (c)(2)
are subsections (a)(1)(A), (a)(1)(B), (a)(2)(A), (a)(2)(B)(i),
(a)(2)(B)(ii), (a)(2)(B)(iii), (a)(2)(B)(iv), (b)(1), (b)(2)(A), (b)(2)(B),
(b)(2)(C), (b)(2)(D), (c)(1), (d)(1), and (d)(4).  The five provisions
that would not collapse into subsection (c)(2) are subsections
(a)(1)(C), (a)(2)(C), (b)(3), (d)(2), and (d)(3).  They involve
wrongfully preventing a third party from conveying information to
law enforcement personnel, which is conduct upstream from an
official proceeding.  To confirm the details, a reader may review the
appendix to this dissent, which sets forth section 1512 in its entirety.

20

warranting at most three years—a distinction reflected in the broader structure of section 1512.

Third, the government's interpretation of subsection (c)(2) would swallow up various other chapter 73 offenses outside of section 1512. Two of the most longstanding chapter 73 offenses are sections 1503 and 1505, which trace back at least to 1909. *See United States v. Poindexter*, 951 F.2d 369, 380 (D.C. Cir. 1991). Section 1505 prohibits corruptly obstructing proceedings pending before Congress or executive agencies. Absent an act of terrorism, it imposes a maximum sentence of five years. Under the government's reading of section 1512(c)(2), all 197 words of this section are made surplusage by 13 words nested in a subparagraph of a subsection in the middle of section 1512.[5] Section 1503 prohibits corruptly influencing a juror or court officer and, absent an attempted killing or a class A or class B felony, authorizes a maximum sentence of ten years. 18 U.S.C. § 1503(b)(3). The government's interpretation of subsection (c)(2) makes that part of section 1503 redundant, leaving only its separate application to acts of harming protected persons after the fact.

To explain all this surplusage, the lead opinion notes that section 1512(c) was enacted after the other provisions in question. As it notes, section 1512 reaches acts of direct obstruction such as a defendant destroying evidence himself,

---

[5]  The government suggests that its interpretation of section 1512(c)(2) would not make section 1505 completely redundant because a "proceeding" under section 1505 might not be an "official proceeding" under section 1512. But the government's own Criminal Resource Manual explains that the definition of "official proceeding" in section 1515(a)(1) is largely "a restatement of the judicial interpretation of the word 'proceeding' in §§ 1503 and 1505." U.S. Dep't of Just., Crim. Res. Manual § 1730 (1997); *see also United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

21

as well as acts of indirect obstruction such as the defendant pressuring others to do so. *Ante* at 35. And unless Congress wanted to rewrite the entire statute, it could not reach direct obstruction without creating some overlap with earlier provisions reaching indirect obstruction. But the government's interpretation does not create such massive surplusage by reaching direct as well as indirect obstruction. Instead, it does so by so dramatically broadening what counts as obstruction in the first place, sweeping in all acts that affect or hinder a proceeding (including, as explained below, such protected activities as advocacy, lobbying, and protest).

The concurrence, for its part, again claims that my interpretation creates the same degree of surplusage as the government's. *Ante* at 17–18 (opinion of Walker, J.). A few illustrations rebut this assertion. Consider section 1512(d)(1), which authorizes a three-year term of imprisonment for anyone who harasses and thereby hinders any person from "attending or testifying in an official proceeding." Someone who prevents spectators from attending a proceeding has surely influenced or affected the proceeding—and thus violated subsection (c)(2) on the government's interpretation. But that person has not impaired the integrity or availability of evidence for use in the proceeding—and thus has not violated section 1512(c) on my interpretation. At the other end of the penalty scheme, the same point holds true for subsection (a)(1)(A), which authorizes a thirty-year sentence for attempts to kill someone to prevent the "attendance or testimony of any person in an official proceeding." For both provisions, my interpretation yields partial overlap with subsection (c)(2), in cases involving the killing or intimidation of witnesses as opposed to spectators. On the other hand, the government's interpretation yields complete surplusage.

22

Taking a step back, the concurrence is nonetheless correct that my evidence-focused interpretation of section 1512(c) creates significant overlap with other provisions of section 1512. But if that counts as a significant flaw with my position, the solution is surely not to *broaden* the scope of section 1512(c) to what the government suggests, and thereby significantly *increase* the degree of overlap or surplusage. Instead, the solution would be to *narrow* the scope of section 1512(c) to what the district court suggests, which would more considerably *reduce* the degree of overlap or surplusage.

The concurrence seeks to reduce this substantial surplusage problem by imposing a heightened *mens rea* requirement on section 1512(c). As the concurrence explains, section 1512(c) requires the defendant to have acted "corruptly," unlike the specific-intent crimes set forth in section 1512(a) and 1512(d). *Ante* at 18 (opinion of Walker, J.). But the Supreme Court has explained that there is no "meaningful difference" between acting "corruptly" and acting with a "specific intent" to obtain some unlawful advantage. *Marinello*, 138 S. Ct. at 1108. This remains true even under the concurrence's view that acting "corruptly" under section 1512(c) requires knowledge that one's conduct is unlawful. For it is highly implausible that a defendant could intentionally perform one of the inherently obstructive acts prohibited by section 1512(a) or (d)—such as killing or harassing a person to prevent him from attending or testifying at an official proceeding—without knowledge of that conduct's unlawfulness. Moreover, if all violations of sections 1503 and 1505 involve corrupt action, *see ante* at 8 (opinion of Walker, J.), then the concurrence's position in no way mitigates the surplusage problem involving those provisions.

More generally, both of my colleagues note that some degree of overlap in criminal provisions is common, no

23

construction of section 1512(c)(2) will eliminate all surplusage, and the canons afford no basis for preferring a construction "substituting one instance of superfluous language for another." *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013); *see ante* at 34–35; *ante* at 18–19 (opinion of Walker, J.). All true enough, but surplusage is nonetheless disfavored; other things equal, a construction that creates substantially less of it is better than a construction that creates substantially more. Here, the government's interpretation of subsection (c)(2) would swallow up all of the immediately preceding subsection (c)(1), most of section 1512, and much of the entire chapter 73, reaching dozens of offenses covering much narrower acts and authorizing much lower penalties. I am unaware of any case resolving ambiguity in favor of such wholesale redundancy.

B

The interpretive canons of *ejusdem generis* and *noscitur a sociis* also support a restrained interpretation of section 1512(c). As explained above, these canons reflect linguistic conventions that must factor into the initial assessment whether that provision is ambiguous. They also support resolving any ambiguity in favor of the defendants.

Begin with *ejusdem generis*. It "limits general terms that follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (cleaned up); *see Guardianship Estate of Keffeler*, 537 U.S. at 384. And it "applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics." Scalia & Garner, *supra*, at 199. Here, all agree that subsection (c)(2) is a catchall phrase tacked on after the specific offenses set forth in subsection (c)(1).

*Noscitur a sociis*, or the associated-words canon, provides that "a word is given more precise content by the neighboring

24

words with which it is associated." *Williams*, 553 U.S. at 294. Often, such an association must be inferred from statutory structure or other contextual clues. *E.g.*, *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("words grouped in a list should be given related meaning"). But here, the word *otherwise* directly signals that the subsections are associated. And interpreting the catchall subsection (c)(2) in light of the specific examples in subsection (c)(1) is particularly appropriate given the relative complexity of the examples and breadth of the catchall.

My colleagues argue that both canons are irrelevant because "the word 'otherwise' does not immediately follow a list of terms" and is in a separate subparagraph from subsection (c)(1). *Ante* at 29. But "a listing is not prerequisite" for applying the associated-words canon. Scalia & Garner, *supra*, at 197. And courts have applied *ejusdem generis* "to all sorts of syntactic constructions that have particularized lists followed by a broad, generic phrase." *Id.* at 200. Thus, while a syntactically parallel listing—like "dogs, cats, and other animals," *see ante* at 29—is one way to trigger these canons, it is far from the only way. Moreover, as explained above, we should not elevate Congress's use of line breaks and paragraph numbering over the text it enacted. At bottom, my colleagues reason that section 1512(c)'s syntax and structure do not weave together its subsections tightly enough to justify inferring an association. But the text itself creates the association:

> The *ejusdem generis* rule is an example of a broader linguistic rule or practice to which reference is made by the Latin tag *noscitur a sociis*. Words, even if they are not general words like 'whatsoever' or *'otherwise' preceded by specific words*, are liable to be affected by other words with which they are associated.

25

*Noscitur a Sociis*, Black's Law Dictionary (11th ed. 2019) (emphasis added) (quoting R. Cross, *Statutory Interpretation* 118 (1976)). Put differently, the canons confirm that syntax and structure can sometimes substitute for an association-creating word like *otherwise*. But here we have the word itself.

C

Beyond considerations of surplusage, the structure of section 1512 cuts further against the government's broad reading of subsection (c)(2). As noted above, section 1512 contains 21 separate subparagraphs prohibiting various forms of tampering and obstruction. Setting aside subsection (c)(2), the 20 other provisions are all narrow, and every one of them addresses preserving the flow of truthful (and only truthful) information to investigatory or judicial processes. To break this persistent and uniform focus, one might expect some degree of clarity. Instead, we have the opposite: an *otherwise* connector suggesting that Congress did not intend a major discontinuity in focus or scope.

If subsection (c)(2) were all-encompassing, its placement would also be puzzling. That provision is one subparagraph nested inside a subsection in the middle of 19 otherwise narrow prohibitions. It is not even its own sentence, and it shares with subsection (c)(1) clauses prescribing a *mens rea* element and a maximum punishment. This is exactly where we might expect to find a residual clause for subsection (c)(1). But it is an exceedingly unlikely place to find an all-encompassing residual clause for most of section 1512 and much of chapter 73. Of course, Congress "does not alter the fundamental details of a [statutory] scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

26

Moreover, the government's interpretation of section 1512(c) injects a significant structural anomaly into Chapter 73 because of its 20-year maximum penalty. If section 1512(c) is focused on evidence impairment, then Chapter 73 has a comprehensible scheme of penalties keyed to the seriousness and sophistication of the obstruction. For example, picketing, parading, or using a sound truck to influence a proceeding carries a one-year maximum penalty. 18 U.S.C. § 1507. Using threats or force generally carries a maximum penalty of either 5 or 10 years, depending on whether the proceeding is before a court, an agency, or Congress. *Id.* §§ 1503(b), 1505. And destroying, manipulating, or falsifying evidence carries a maximum penalty of 20 years. *Id.* §§ 1512(c), 1519. This scheme ties the penalty to the sophistication of the obstruction and the kind of proceeding targeted. Rudimentary forms of obstruction, such as picketing, receive the lowest penalty. And the most sophisticated or pernicious forms, such as shredding documents or fabricating evidence, receive the highest. The government's interpretation would collapse all of this, making any form of obstructing an official proceeding a 20-year felony.

Finally, consider the relevant titles, which may "supply cues" about the meaning of operative text. *Yates*, 574 U.S. at 540 (plurality); *see* Scalia & Garner, *supra*, at 221 ("The title and headings are permissible indicators of meaning."). For one thing, Congress inserted the disputed text into section 1512, which is titled "Tampering with a witness, victim, or an informant." Direct obstruction by destroying documents is one modest step removed from indirect obstruction by pressuring a witness to destroy documents. On the other hand, what the government posits is covered, including everything from lobbying to rioting, is much further removed from section 1512's heartland as reflected in its title. Moreover, the title of the statute that enacted section 1512(c) is the Corporate Fraud Accountability Act of 2002. Document destruction readily

27

conjures up images of corporate fraud.  Advocacy, lobbying, and protest do not.  For that matter, neither does assaulting police officers or rioting in the Capitol.

D

Statutory history reinforces that section 1512(c) covers only acts that impair the integrity or availability of evidence. That provision was the first and most significant provision enacted by the Corporate Fraud Accountability Act of 2002, which in turn was part of the larger Sarbanes-Oxley Act.  Pub. L. 107-204, tit. XI, § 1102, 116 Stat. 745, 807.  As the Supreme Court has explained, these statutes were prompted by the Enron Corporation's accounting scandal and collapse, which exposed what was perceived as a significant loophole in the law of obstruction: "corporate document-shredding to hide evidence of financial wrongdoing" was unlawful if one person directed another, but not if he acted alone.  *See Yates*, 574 U.S. at 535–36 (plurality).  This came to be known as the Arthur Andersen loophole, named after Enron's financial auditor.

The government posits that Congress plugged the loophole with a grossly incommensurate patch.  On its view, instead of simply adding a prohibition on direct evidence impairment to preexisting prohibitions on indirect evidence impairment, Congress added a prohibition on obstructing or influencing *per se*.  My colleagues acknowledge the mismatch, but they find it irrelevant because the governing text is unambiguous.  *Ante* at 31.  But the text is ambiguous, and this mismatch is another reason for resolving the ambiguity in the defendants' favor.  Of course, legislation can sweep more broadly than the primary evil that Congress had in mind.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).  However, if the text is ambiguous and an interpretation seems implausible "in light of the context from which the statute arose," that suggests

28

things have gotten off track.  *Bond v. United States*, 572 U.S. 844, 860 (2014); *see* Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021).[6]

E

Section 1512(c)(2) has been on the books for two decades and charged in thousands of cases—yet until the prosecutions arising from the January 6 riot, it was uniformly treated as an evidence-impairment crime.  This settled understanding is a "powerful indication" against the government's novel position. *FTC v. Bunte Bros.*, 312 U.S. 349, 351–52 (1941).

My colleagues note that only two cases have held section 1512(c)(2) requires some form of evidence impairment.  *Ante* at 13–15, 15 n.4.  But until the January 6 prosecutions, courts had no occasion to consider whether it sweeps more broadly, because all the caselaw had involved conduct plainly intended to hinder the flow of truthful evidence to a proceeding.

My colleagues claim only one counterexample, *United States v. Reich*, 479 F.3d 179 (2d Cir. 2007).  The defendant there falsified an official court document and used it to persuade another party to withdraw a filing, *see id.* at 182–83, which plainly influenced an official proceeding.  *Reich* fits well

---

[6]  To the extent it is relevant, legislative history reinforces the statutory focus on evidence impairment.  All of it refers to section 1512(c)(2) as covering document-shredding and other ways to conceal or destroy evidence.  *See* 148 Cong. Rec. S6545–47 (daily ed. July 10, 2002); *id.* at S6549–50.  My colleagues cite one assertedly broader statement by Senator Hatch that section 1512(c) "strengthens an existing federal offense that is often used to prosecute document shredding and other forms of obstruction of justice."  *Id.* at S6550.  But he described these other forms of obstruction as merely other ways of "destroying evidence."  *Id.*

29

within an evidence-focused interpretation of subsection (c)(2), for subsection (c)(1) extends to falsifying any "record" or "document" connected to an official proceeding, not just documents formally admitted into evidence.

Moreover, even the cases cited by my colleagues acknowledge that the word *otherwise* connects subsections (c)(1) and (c)(2) and recognize the latter subsection's focus on evidence. For example, *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), explained that the two subsections "are linked with the word 'otherwise,' so we can safely infer that Congress intended to target the same type of … misconduct that might 'otherwise' obstruct a proceeding beyond simple document destruction." *Id.* at 809. And *United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015), praised a jury instruction explaining that the defendant must "contemplate some particular official proceeding in which the testimony, record, document, or other object might be material." *Id.* at 445 n.2. *See also United States v. Volpendesto*, 746 F.3d 273, 287 (7th Cir. 2014) (affirming conviction based on sufficient evidence that the defendant acted "out of desire to influence what evidence came before the grand jury"); *United States v. Desposito*, 704 F.3d 221, 231 (2d Cir. 2013) (affirming conviction because the defendant had planned "to create fraudulent evidence").

F

The Supreme Court repeatedly has rejected "improbably broad" interpretations of criminal statutes that would reach significant areas of innocent or previously unregulated conduct. *Bond*, 572 U.S. at 860; *see*, *e.g.*, *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (rejecting interpretation of computer fraud statute that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *McDonnell v. United States*, 579 U.S. 550, 574–76 (2016)

30

(rejecting "expansive interpretation" of bribery statute that would reach "normal political interaction between public officials and their constituents"); *Bond*, 572 U.S. at 863 (rejecting interpretation that would turn chemical weapons statute "into a massive federal anti-poisoning regime that reaches the simplest of assaults").  Likewise, the Court routinely disfavors interpretations that would make a statute unconstitutional—or even raise serious constitutional questions.  *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  Here, the government's interpretation would make section 1512(c)(2) both improbably broad and unconstitutional in many of its applications.

In the government's view, subsection (c)(2) reaches any act that obstructs, influences, or impedes an official proceeding—which means anything that affects or hinders the proceeding, *see Marinello*, 138 S. Ct. at 1106.  Among other things, that construction would sweep in advocacy, lobbying, and protest—common mechanisms by which citizens attempt to influence official proceedings.  Historically, these activities did not constitute obstruction unless they directly impinged on a proceeding's truth-seeking function through acts such as bribing a decisionmaker or falsifying evidence presented to it.  And the Corporate Fraud Accountability Act of 2002, which created section 1512(c), seems an unlikely candidate to extend obstruction law into new realms of political speech, just as the Chemical Weapons Convention Implementation Act seemed an unlikely candidate to regulate the tortious use of commercially available chemicals to cause an "uncomfortable rash."  *See Bond*, 572 U.S. at 851–52.

Consider a few basic examples.  An activist who successfully rails against bringing a bill to a vote on the Senate floor has obstructed or influenced an official proceeding.  (For

31

purposes of section 1512, the proceeding "need not be pending or about to be instituted at the time of the offense."  18 U.S.C. § 1512(f)(1).)    A lobbyist who successfully persuades a member of Congress to change a vote has likewise influenced an official proceeding.  So has a peaceful protestor who, attempting to sway votes, holds up a sign in the Senate gallery before being escorted away.  Of course, this case involves rioting as opposed to peaceful advocacy, lobbying, or protest. But the construction of section 1512(c) adopted by my colleagues will sweep in all of the above.  And this breadth is especially problematic because section 1512 applies to congressional and executive proceedings as well as judicial ones.  There is no constitutional or historical pedigree for lobbying to influence judicial decisions in pending cases.  But advocacy, lobbying, and protest before the political branches is political speech that the First Amendment squarely protects. *E.g.*, *Edwards v. South Carolina*, 372 U.S. 229, 235–36 (1963). Thus, "to assert that all endeavors to influence, obstruct, or impede the proceedings of congressional committees are, as a matter of law, corrupt would undoubtedly criminalize some innocent behavior."  *United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990) (cleaned up).  Judge Silberman made the same point more colorfully:    "If attempting to influence a congressional committee *by itself* is a crime, we might as well convert all of Washington's office buildings into prisons."  *Id.* at 942 (opinion dissenting in part).

My colleagues dismiss this concern with a promise that the statute's one-word *mens rea* requirement—"corruptly"—will impose meaningful limits even if its 30-word *actus reus* does not.  But the lead opinion does not even settle on what that requirement is, much less explain how it would cure the improbable breadth created by an all-encompassing view of the

32

*actus reus*.  And the various possibilities that my colleagues suggest do not inspire much confidence.

First, the lead opinion cites *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), for the proposition that acting *corruptly* may require nothing more than an act that is "wrongful, immoral, depraved, or evil."  *Ante* at 17.  But while *Arthur Andersen* did describe those adjectives as "normally associated" with the word *corruptly*, 544 U.S. at 705, it nowhere suggested that this adjectival string could supply a complete definition.  Instead, it held that the jury instruction before it was legally deficient for failing to require either consciousness of wrongdoing or a sufficient connection between the disputed conduct and an official proceeding.  *See id.* at 705–08.  Moreover, we have held that this precise adjectival string neither narrows nor clarifies a statutory requirement of acting corruptly.  *Poindexter*, 951 F.2d at 379.

This problem is particularly serious given the breadth of section 1512(c).  *Arthur Andersen* involved section 1512(b), which covers narrow categories of inherently wrongful conduct such as preventing the testimony of a third party, causing another person to withhold evidence, or preventing the communication of evidence to a law enforcement officer or judge.  In contrast, the *actus reus* posited here would sweep in any conduct that influences or affects an official proceeding. Imagine a tobacco or firearms lobbyist who persuades Congress to stop investigating how many individuals are killed by the product.  Would the lobbyist violate section 1512(c)(2) because his conduct was "wrongful" or "immoral" in some abstract sense?  Or what if the lobbyist believed that his work was wrongful or immoral, but did it anyway to earn a living? The lead opinion dismisses such hypotheticals, *ante* at 17, but without explaining why liability would not attach under a mere requirement of acting wrongfully.  Moreover, probing the

33

defendant's mental state is a question of fact for the jury. *See*, *e.g.*, *North*, 910 F.2d at 942 (Silberman, J., dissenting in part) ("it seems inescapable that this is a question of fact for the *jury* to determine whether an endeavor was undertaken corruptly"). A wrongfulness standard thus would impose few limits on the government's ability to charge, or a jury's ability to convict, for conduct directed at an official proceeding. Decades ago, we observed that a statute reaching conduct that is not "decent, upright, good, or right" "affords an almost boundless area for individual assessment of the morality of another's behavior." *Ricks v. District of Columbia*, 414 F.2d 1097, 1106 (D.C. Cir. 1968) (cleaned up). The same can be said for a statute reaching "wrongful, immoral, depraved, or evil" conduct. Under such a vague standard, *mens rea* would denote little more than a jury's subjective disapproval of the conduct at issue.

Second, the lead opinion proposes that acting *corruptly* may mean acting with a "corrupt purpose" or through "independently corrupt means." *Ante* at 18. And because the defendants here allegedly acted through the corrupt means of assaulting police officers, the lead opinion continues, we may safely move on without considering what constitutes a "corrupt purpose." *Id.* The lead opinion invokes other opinions stating that the use of unlawful means is sufficient, but not necessary, to show corrupt action. *See North*, 910 F.2d at 942–43 (Silberman, J., dissenting in part); *United States v. Sandlin*, 575 F. Supp. 3d 16, 31 (D.D.C. 2021). But that only underscores the problem: If a "corrupt purpose" may suffice to show acting corruptly, what purposes count as "corrupt"? Perhaps ones that are wrongful, immoral, depraved, or evil, but that would just replicate the vagueness and overbreadth concerns noted above.

Moreover, even if independently unlawful means were necessary, section 1512(c)(2) still would cover large swaths of advocacy, lobbying, and protest. Consider a few more

34

examples. A protestor who demonstrates outside a courthouse, hoping to affect jury deliberations, has influenced an official proceeding (or attempted to do so, which carries the same penalty). So has an EPA employee who convinces a member of Congress to change his vote on pending environmental legislation. And so has the peaceful protestor in the Senate gallery. Under an unlawful-means test, all three would violate section 1512(c)(2) because each of them broke the law while advocating, lobbying, or protesting. *See* 18 U.S.C. § 1507 (prohibiting picketing outside a courthouse with the intent to influence a judge, juror, or witness); *id.* § 1913 (prohibiting lobbying by agency employees); 40 U.S.C. § 5104(e)(2)(G) (prohibiting demonstrating inside the Capitol Building). And each would face up to 20 years' imprisonment—rather than maximum penalties of one year, a criminal fine, and six months, respectively. So while this approach would create an escape hatch for those who influence an official proceeding without committing any other crime, it also would supercharge a range of minor advocacy, lobbying, and protest offenses into 20-year felonies. That still gives section 1512(c)(2) an improbably broad reach, because it posits that the Corporate Fraud Accountability Act extended the harsh penalties of obstruction-of-justice law to new realms of advocacy, protest, and lobbying.

Third, the lead opinion suggests adding a further *mens rea* requirement urged by Justice Scalia in *United States v. Aguilar*, 515 U.S. 593 (1995). There, he stated that acting "corruptly" requires "an act done with an intent to give some advantage inconsistent with official duty and the rights of others." *Id.* at 616 (Scalia, J., dissenting in part) (cleaned up); *see also id.* at 616–17 ("An act is done corruptly if it's done … with a hope or expectation of either financial gain or other benefit to oneself or a benefit of another person." (cleaned up)). Likewise, Black's Law Dictionary states that the word *corruptly*, as used

35

in criminal statutes, usually "indicates a wrongful desire for pecuniary gain or other advantage." *Corruptly*, Black's Law Dictionary (11th ed. 2019).

This improper-benefit test may significantly narrow section 1512(c)(2), but only by excluding these defendants. As traditionally applied, the test seems to require that the defendant seek an unlawful financial, professional, or exculpatory advantage. *See, e.g.*, *Marinello*, 138 S. Ct. at 1105 (avoiding taxes); *Aguilar*, 515 U.S. at 595 (disclosing wiretap); *North*, 910 F.2d at 851 (fabricating false testimony and destroying documents). In contrast, this case involves the much more diffuse, intangible benefit of having a preferred candidate remain President. If that is good enough, then anyone acting to achieve a specific purpose would satisfy this requirement, for the purpose of the action would qualify as the benefit. For example, the hypothetical firearms lobbyist would be covered if he sought a "benefit" of less stringent gun regulations. Likewise, the hypothetical Senate protestor would do so if she sought a "benefit" of defeating the bill under review. And so on.

The concurrence urges a more stringent *mens rea* requiring the defendant to *know* that he is acting unlawfully. *Ante* at 15 (opinion of Walker, J.). The concurrence relies most heavily on three dissents. But two of them reject the concurrence's own proposed standard. *See Aguilar*, 515 U.S. at 617 (Scalia, J., dissenting in part) ("in the context of obstructing grand jury proceedings, any claim of ignorance of wrongdoing is incredible"); *North*, 910 F.2d at 940 (Silberman, J., dissenting in part) ("I would decline to hold here that section 1505 requires knowledge of unlawfulness"); *see also id.* at 884 (majority) ("If knowledge of unlawfulness were required in order to convict a defendant of violating section 1505, North's

36

argument might be more colorable.  But this is not the case.").[7]
That leaves *Marinello*, which involved a statute making it
unlawful to "corruptly" endeavor to "obstruct or impede, the
due administration" of the Tax Code, 26 U.S.C. § 7212(a).  In
that case, Justice Thomas concluded that *corruptly* "requires
proof that the defendant not only knew he was obtaining an
unlawful benefit, but that his objective or purpose was to obtain
that unlawful benefit."   138 S. Ct. at 1114 (Thomas, J.,
dissenting) (cleaned up); *accord United States v. Floyd*, 740
F.3d 22, 31 (1st Cir. 2014).  But the allowance for mistake of
law as a complete defense in the tax context reflects "special
treatment of criminal tax offenses … due to the complexity of
the tax laws."   *Cheek v. United States*, 489 U.S. 192, 200
(1991).    The  concurrence's  approach  thus  requires
transplanting  into  section  1512(c)(2)  an  interpretation  of
*corruptly* that appears to have been used so far only in tax law.

The concurrence's approach is driven by a laudable goal—
narrowing what the concurrence recognizes would otherwise
be the "breathtaking" and untenable scope of the government's
interpretation of section 1512(c).  *Ante* at 1, 3 n.1, 14–15, 22
n.10 (opinion of Walker, J.).  But even with the concurrence's
torqued-up *mens rea*, section 1512(c)(2) still would have
improbable breadth.    It would continue to supercharge
comparatively minor advocacy, lobbying, and protest offenses
into 20-year felonies, provided the defendant knows he is
acting unlawfully in some small way.   The concurrence
imagines a protestor unaware that federal law prohibits
picketing outside the home of a judge to influence his or her
votes.  18 U.S.C. § 1507.  But even that hypothetical protestor
would be protected only until the jurist, a neighbor, or the

---

[7]  Both opinions included partial concurrences, but the relevant
discussion in each one occurred in a partial dissent.  *See Aguilar*, 515
U.S. at 609–12 (Scalia, J.); *North*, 910 F.2d at 938–46 (Silberman,
J.).

37

police told the protestor what the law is. After that, the concurrence's position would expose the protestor not only to the one-year sentence set forth in section 1507, but also to the twenty-year sentence set forth in section 1512(c).

Finally, my colleagues' approach creates vagueness problems as well as First Amendment ones. Consider 18 U.S.C. § 1505, which imposes criminal penalties on anyone who "corruptly … influences, obstructs, or impedes" a congressional inquiry. In *Poindexter*, we held this provision unconstitutionally vague as applied to acts of lying to Congress. 951 F.2d at 379. In rejecting the government's argument that the *mens rea* requirement sufficiently narrowed the statute, we explained that "on its face, the word 'corruptly' is vague," *id.* at 378, as were the string of adjectival synonyms. *See id.* at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'"). To cure the vagueness, we limited the *act* component of section 1505. Specifically, we held that it applies only to acts causing a third party to violate some legal duty, thus excluding acts by which the defendant directly attempts to influence the proceeding. *Id.* at 379–86. But this saving construction is not available here. As explained earlier, one thing section 1512(c) clearly did is break down the distinction between direct and indirect obstruction. So, if subsection (c)(2) covers all obstructive acts, direct and indirect, it has the same breadth that caused the *Poindexter* court to find unconstitutional vagueness. And as with the First Amendment objection, it is no answer to say that section 1512(c) may be constitutionally applied to the extreme conduct alleged here. That is true, but the government's construction still creates improbable breadth and a host of unconstitutional applications in other cases, even with the requirement of acting "corruptly."

38

In sum, there is no plausible account of how section 1512(c)(2) could sweep in these defendants yet provide "significant guardrails" through its requirement of acting "corruptly," *ante* at 16. Rather than try to extract meaningful limits out of that broad and vague adverb, we should have acknowledged that Congress limited the *actus reus* to conduct that impairs the integrity or availability of evidence.

G

If there were any remaining doubt, the rule of lenity would resolve this case for the defendants. At a high level of generality, the rule has provoked recent controversy. Some justices think it applies "[w]here the traditional tools of statutory interpretation yield no clear answer." *Wooden v. United States*, 142 S. Ct. 1063, 1085–86 (2022) (Gorsuch, J., concurring in the judgment). Others think it applies "only when after seizing everything from which aid can be derived, the statute is still grievously ambiguous." *Id.* at 1075 (Kavanaugh, J., concurring) (cleaned up). Regardless of that ongoing debate, the rule of lenity applies here.

In the specific context of obstruction of justice, the Supreme Court repeatedly has emphasized the need for caution. For example, *Yates* involved another Sarbanes-Oxley provision that prohibits knowingly concealing or making a false entry in any record, document, or tangible object. 18 U.S.C. § 1519. The Court refused to construe the provision as "an all-encompassing ban on the spoliation of evidence," citing, among other factors, its "position within Chapter 73 of Title 18." 574 U.S. at 540 (plurality); *see also id.* at 549–52 (Alito, J., concurring in the judgment). In *Marinello*, the Court rejected a reading of the Internal Revenue Code that would "transform every violation of the Tax Code into an obstruction charge." 138 S. Ct. at 1110. And in *Arthur Andersen*, the Court

39

held that "restraint [was] particularly appropriate" to avoid reading an obstruction statute to criminalize comparatively innocuous acts of persuasion. 544 U.S. at 703–04. In all three cases, the Court applied the rule of lenity. *See Yates*, 574 U.S. at 548 (plurality); *Marinello*, 138 S. Ct. at 1106; *Arthur Andersen*, 544 U.S. at 703–04. The Supreme Court's message in these and other cases has been "unmistakable: Courts should not assign federal criminal statutes a 'breathtaking' scope when a narrower reading is reasonable." *United States v. Dubin*, 27 F.4th 1021, 1041 (5th Cir. 2022) (Costa, J., dissenting). By glossing over section 1512(c)(2)'s ambiguity and adopting an all-encompassing interpretation, my colleagues diverge from the approach reflected in these cases.

V

The conduct alleged here violates many criminal statutes, but section 1512(c) is not among them. Because my colleagues conclude otherwise, I respectfully dissent.

40

Appendix — 18 U.S.C. § 1512

## § 1512.  Tampering with a witness, victim, or an informant

**(a)(1)** Whoever kills or attempts to kill another person, with intent to--

    **(A)** prevent the attendance or testimony of any person in an official proceeding;

    **(B)** prevent the production of a record, document, or other object, in an official proceeding; or

    **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to--

    **(A)** influence, delay, or prevent the testimony of any person in an official proceeding;

    **(B)** cause or induce any person to--

        **(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

        **(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

        **(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

        **(iv)** be absent from an official proceeding to which that person has been summoned by legal process; or

41

(**C**) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

(**3**) The punishment for an offense under this subsection is--
(**A**) in the case of a killing, the punishment provided in sections 1111 and 1112;
(**B**) in the case of--
(**i**) an attempt to murder; or
(**ii**) the use or attempted use of physical force against any person;
imprisonment for not more than 30 years; and
(**C**) in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

(**b**) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
(**1**) influence, delay, or prevent the testimony of any person in an official proceeding;
(**2**) cause or induce any person to--
(**A**) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
(**B**) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
(**C**) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

42

      **(D)** be absent from an official proceeding to which such person has been summoned by legal process; or
    **(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

**(c)** Whoever corruptly--
    **(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
    **(2)** otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

**(d)** Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--
    **(1)** attending or testifying in an official proceeding;
    **(2)** reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;
    **(3)** arresting or seeking the arrest of another person in connection with a Federal offense; or
    **(4)** causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

43

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

(**e**) In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

(**f**) For the purposes of this section--
(**1**) an official proceeding need not be pending or about to be instituted at the time of the offense; and
(**2**) the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

(**g**) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance--
(**1**) that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or
(**2**) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

(**h**) There is extraterritorial Federal jurisdiction over an offense under this section.

(**i**) A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be

44

affected or in the district in which the conduct constituting the alleged offense occurred.

**(j)** If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

**(k)** Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.